Lanzinger, J.
I. Introduction
{¶ 1} This contract dispute is a portion of ongoing litigation initiated by appellants,[1] the governing boards of ten Cleveland community schools, commonly called “charter schools” (collectively, “the schools”). The defendants-appellees are private for-profit companies White Hat Management, L.L.C., and WHLS of Ohio, L.L.C., and ten subsidiary companies (collectively, “the companies”)[2] that operated and managed the schools (collectively, “White Hat”), pursuant to contracts with each school. The State Board of Education was also named in the *31 complaint. The schools ask us to decide the ownership of personal property used by White Hat in the schools’ daily operations. White Hat claims the right to retain the disputed property unless the schools make certain payments to the management companies as set forth in the contracts.
{¶ 2} Although, as will be seen, the wisdom of the buy-back term can be questioned, we hold that the term is enforceable and that this case must be returned to the trial court for an inventory of the property and its disposition according to the contracts. We rule narrowly on the issues before us, leaving public-policy matters to the General Assembly.
II. The Background of the Litigation
{¶ 3} As permitted by statute, see R.C. 3314.03, the governing authority of each school entered into an individual management agreement (collectively, “the contracts”) in November 2005 with one of the ten named education-management organizations owned by White Hat. Each contract was substantially identical.
{¶ 4} Under the contracts, White Hat was paid either 95 or 96 percent of the revenue-per-student funding that the school received from the state of Ohio Department of Education pursuant to R.C. Title 33 and other applicable statutes. This fixed amount, sometimes characterized as a per-pupil payment, was known in the contract as the “Continuing Fee.” In addition, all federal, state, and local government education grants were to be paid to White Hat.
{¶ 5} In return, White Hat agreed to provide all functions relating to the provision of the White Hat educational model and the day-to-day management and operation of the schools. The schools retained the right to perform their own accounting, financial reporting, and audit functions, but White Hat was responsible for most other aspects of the operation of the schools, including providing a facility, meeting all staffing and academic needs, and purchasing all furniture, computers, books, and other equipment.
{¶ 6} The various management contracts ran from November 1, 2005, until June 30, 2007, and provided for automatic renewal thereafter for consecutive one-year terms through June 30, 2010, unless terminated for cause. The schools did not perform well under White Hat’s management. Of the ten original schools, as of the 2010-2011 school year, two Hope Academies had been shut down by the Department of Education due to academic failure and three were on “academic watch”; one of the Life Skills Centers was on academic watch and a second was on “academic emergency” (one step away from shut-down). This poor performance caused the schools to raise several issues, including how White Hat spent the money it received to operate the schools. Financial information revealed that White Hat spent money to purchase buildings ultimately owned by or renovated for the benefit of its own affiliates. According to the schools, although White Hat *32 used part of the continuing fee to purchase personal property for use in the schools, it improperly titled that property in its own name.
{¶ 7} The governing authorities of the schools filed the instant lawsuit on May 17, 2010, after White Hat refused to provide further information concerning the use of allegedly public funds. The complaint sought declaratory and injunctive relief, an accounting, and damages for breach of contract and breach of fiduciary duty. As part of their allegations, the schools disputed White Hat’s claim of entitlement to all property White Hat purchased using public funds. Specifically, the schools challenged the operation of Section 8.a.i of the contracts, which stated that the schools could retain personal property owned by White Hat after termination of the contracts only by “paying to [White Hat] an amount equal to the ‘remaining cost’ basis of the personal property on the date of termination.”
{¶ 8} After the action was filed, the parties executed a series of interim or “standstill” management agreements, which permitted them to continue operations as if the contracts were still in effect. On February 21, 2012, the schools filed a motion for partial summary judgment, asking the court to declare the property rights of the parties under the terms of their contracts and applicable laws.
{¶ 9} On May 11, 2012, the trial court granted the motion in part and denied it in part. The court upheld the contract term that required the schools to pay Wfiiite Hat an amount equal to the “remaining cost basis” before obtaining the personal property titled in White Hat’s name. It also upheld the schools’ right to assume existing leases or to enter into new leases of facilities owned by WTiite Hat at fair market value.[3] The trial court granted the schools’ motion for a Civ.R. 54(B) certification and found that there was no just reason for delay.
{¶ 10} The schools appealed. The Tenth District Court of Appeals affirmed the trial court’s judgment and held that the continuing fee paid to White Hat lost its nature as “public funds” once the funds came into Wfiiite Hat’s possession and control. Hope Academy Broadway Campus v. White Hat Mgt., L.L.C., 10th Dist. Franklin No. 12AP-496, 2013-Ohio-5036, 4 N.E.3d 1087, ¶ 24. The appellate court held that the contract was unambiguous and that it conferred on White Hat the authority to require the schools to buy back any personal property purchased by White Hat using the continuing fee. The court also stated that there was “no formal general fiduciary duty created by the agreements that required White Hat to purchase and hold property for the schools’ benefit.” Id. at ¶ 39.
*33 III. Issues Before This Court
{¶ 11} We accepted the schools’ appeal on three propositions of law, summarized as follows: (1) Public funds paid to a private entity exercising a governmental function, such as the operation of a community school, retain their character as public funds even after they are in the possession and control of the private entity; (2) When a private entity operating a community school uses funds designated by the Ohio Department of Education for the education of public-school students to purchase furniture, computers, software, equipment, and other personal property for the school, the private entity is acting as a purchasing agent and the property must be titled in the name of the community school; (3) A private entity that agrees to operate all functions of a community school has a fiduciary relationship with the community school. 138 Ohio St.3d 1448, 2014-Ohio-1182, 5 N.E.3d 666.
{¶ 12} While we affirm that portion of the judgment of the court of appeals that upheld the buy-back provision as enforceable against the schools, we reverse the judgment of the court of appeals on the issue of the existence of a fiduciary relationship between the parties. We hold that an entity that manages the daily operations of a community school pursuant to a contract with the school’s governing authority is an “operator” within the meaning of R.C. 3314.02(A)(8)(a). We also hold that a management company that undertakes daily operation of a community school has a fiduciary relationship with the community school it operates. Because the management company of a community school is performing a traditional government function, that fiduciary relationship between the company and its community school is implicated when the company spends public funds to purchase personal property for use in the school it operates. We therefore affirm in part and reverse in part the judgment of the Tenth District Court of Appeals and remand this case to the trial court for further proceedings.
IY. Legal Analysis
{¶ 13} A brief overview of relevant legislation is needed to place this dispute in context.

Community-School Legislation: R.C. Chapter 8311

{¶ 14} Community-school legislation became effective in 1997 when the General Assembly enacted R.C. Chapter 3314, titled the Community Schools Act. Am.Sub. H.B. No. 215, 147 Ohio Laws, Part I, 909, 1187. The General Assembly declared that its purposes in enacting this chapter included “providing parents a choice of academic environments for their children and providing the education community with the opportunity to establish limited experimental educational programs in a deregulated setting.” Id., Section 50.52, Subsection 2(B), 147 Ohio Laws, Part I, 2043.
*34 {¶ 15} We upheld the statutes as constitutional and held that community-schools are part of Ohio’s public school system. State ex rel. Ohio Congress of Parents & Teachers v. State Bd. of Edn., 111 Ohio St.3d 568, 2006-Ohio-5512, 857 N.E.2d 1148, syllabus, and ¶ 32. See also R.C. 3314.01(B) (“A community school created under this chapter is a public school * * * ”). We also recognized that educational policy decisions are within the purview of the General Assembly. Id. at ¶ 73. Since its enactment, R.C. Chapter 3314 has been amended repeatedly. Yet, as this case shows, many aspects remain unchanged.
{¶ 16} The legislation establishing community schools distinguishes among three types of entities: sponsors, governing authorities, and operators. These terms should be closely examined to more fully understand R.C. Chapter 3314.

Sponsors

{¶ 17} The community school operates under a contract with a “sponsor” that monitors the school’s performance according to state laws and regulations. R.C. 3314.02(A)(1) arid (C)(1); 3314.03(A)(4). A sponsor must first be approved and then monitored on its performance by the Ohio Department of Education. R.C. 3314.015(A)(2) and (3). It must enter into a detailed contract with the governing authority of the school, the required terms of which are set by statute. R.C. 3314.03(A)(1) through (26). The school must also submit to the sponsor a comprehensive plan for the school, R.C. 3314.03(B), which must specify certain details, such as internal financial controls and the process by which the governing authority’s members will be selected in the future, R.C. 3314.03(B)(1) and (5). The sponsor must monitor the governing authority’s compliance with its contract, evaluate the community school’s academic and fiscal performance, and take action if the community school fails academically or financially. R.C. 3314.03(D)(1), (2), and (5). The sponsor may suspend the operation of a community school that does not comply with its contract. R.C. 3314.07(B)(1)(c). Sponsors may receive fees of up to 3 percent of total payments for operating expenses that the school receives from the state. R.C. 3314.03(C).

Governing Authorities

{¶ 18} A community school itself must be organized as either a “nonprofit corporation” or a “public benefit corporation” depending on when it was established. R.C. 3314.03(A)(1). Each community school must have a “governing authority,” which shall consist of a board of no fewer than five individuals. R.C. 3314.03(A)(14); 3314.02(E)(1). Even though community schools are exempt from most of the state laws and regulations that apply to other public schools, see R.C. 3314.04, they are not free from oversight. The community school’s governing authority must account to its sponsor for the school’s performance, and the sponsor is, in turn, accountable to the Ohio Department of Education. State ex *35 rel. Ohio Congress of Parents & Teachers v. State Bd. of Edn., 111 Ohio St.3d 568, 2006-Ohio-5512, 857 N.E.2d 1148, at ¶ 7. R.C. 3314.04 exempts community-schools from the rules governing boards of education set forth in R.C. Chapter 3313, but R.C. Chapter 3314 imposes its own duties and responsibilities on community schools.

Operators

{¶ 19} A community school may contract “for any services necessary for the operation of the school.” R.C. 3314.01(B). The governing authority of a community school has the option to hire an operator (usually a management company) to manage the day-to-day workings of the school. See R.C. 3314.02(A)(8)(a); 3314.026. An operator is an entity that is distinct from a sponsor. R.C. 3314.02(A)(1) (defining “sponsor”) and 3314.02(A)(8) (defining “operator”).
{¶ 20} In this ease, the schools contracted with White Hat for the daily management and operation of their community schools. Yet it remains a fact that operators, unlike sponsors and governing authorities, remain largely unregulated. R.C. 3314.02(A)(8) defines an “operator” as either (a) an individual or organization that manages a community school’s daily operations pursuant to a contract with the school’s governing authority or (b) a nonprofit organization that provides “programmatic oversight and support” to a community school pursuant to a contract with its governing authority. White Hat fits squarely within the first definition.
{¶ 21} But although the statutes define what an operator is, R.C. Chapter 3314 is largely silent on an operator’s duties and its status vis-á-vis a community school’s governing authority and its sponsor. Although legislation has been introduced to further amend the Community Schools Act and to provide enhanced oversight, there are currently no specific requirements for the content of the contracts between the governing authority and an operator.[4] Most of the existing statutory references to an operator are nonsubstantive.[5] While fees to sponsors are capped, R.C. 3314.03(C), there is no ceiling on the amount of funding that can be passed on to private operators such as White Hat. Indeed, the schools in this case transferred to White Hat nearly all of the taxpayer dollars they otherwise would have retained for the education of students.

*36
Positions of the Parties

{¶ 22} Now that their contracts have terminated, the parties dispute ownership of the personal property that was used in the schools’ daily operations during the lives of the contracts.[6] The schools argue that operating a community school for public-school students is a governmental function and that White Hat should be accountable for the public funds it received because these funds remained public even after they were transferred to White Hat’s possession. The schools also contend that funds designated for educating public-school students must be used for the schools’ benefit and that a private entity operating a community school has a fiduciary relationship with that school.
{¶ 23} White Hat responds that the General Assembly has already provided for accountability by requiring White Hat to submit detailed financial accounts for inclusion in the community school’s financial statements, which are subject to audit. R.C. 3314.024. White Hat argues that funds do not retain their public character after they have been received by the party being paid. White Hat also emphasizes that community-school legislation expressly contemplates that the parties will negotiate their respective duties and privileges in an enforceable contract and that its contracts state that the operator is an independent contractor rather than an agent or fiduciary.
{¶ 24} We now examine the contract terms that relate to this dispute over personal property used in the schools.

The Contract Language

{¶ 25} Section 2 of the contract sets out the services that White Hat must provide the schools. Subsection 2.b.i (subtitled “Equipment”) states:
The Company [i.e., the relevant White Hat subsidiary-operator] shall purchase or lease all furniture, computers, software, equipment and other personal property necessary for the operation of the School. Additionally, the Company shall purchase on behalf of the School any furniture, computers, software, equipment, and other personal property which, by the nature of the funding source, must be titled in the School’s name.
(Emphasis added.)
{¶ 26} Section 8 provides for payment of fees and defines the “continuing fee” as either 95 or 96 percent (depending on the school) “of the revenue per student received by the School from the State of Ohio Department of Education” and *37 certain other payments paid to the school by government sources. Section 8.a.i then provides that all costs incurred in providing the White Hat educational model shall be paid by White Hat, including the cost of purchasing books, computers, equipment, and other property for use in the schools. The source of funds for those purchases is, of course, the continuing fee, i.e., public money. In the same subsection related to payment of costs, 8.i, the contract states:
It is understood that at the School’s election, upon termination of this Agreement all personal property used in the operation of the School and owned by the Company or one of its affiliates and used in the operation of the School, other than proprietary materials owned by the Company, may become the property of the School free and clear of all liens or other encumbrances upon the School paying to the Company an amount equal to the “remaining cost basis” of the personal property on the date of termination.
(Emphasis added.)
{¶ 27} Section 12.c of each contract again refers to the schools’ obligation to pay before they may receive title to personal property used to operate the schools:
Equipment and Personal Property. On or before the Termination Date, and after the payment of the “remaining cost basis” to be made by the School in accordance with Section 8(a), herein the Company shall transfer title to the School, or assign to the School the leases (to the extent such leases are assignable), for any and all computers, software, office equipment, furniture and personal property used to operate the School, other than the Company’s proprietary materials.
(Emphasis added.)
{¶ 28} The schools maintain that the contract cannot be interpreted to require them, upon termination of the contract, to buy back the personal property used in the schools’ operation. The schools point to the phrase from Section 2.b.i: “the Company shall purchase on behalf of the School any * * * personal property which, by the nature of the funding source, must be titled in the School’s name.” When the nature of the funding source is public, title of the property must reside in the schools.
{¶ 29} White Hat counters that this interpretation renders meaningless the contractual requirement that White Hat purchase the personal property. It *38 claims that the funding source referred to was “usually a grant,” which requires the property to be titled in the schools’ name.
{¶ 30} But nothing in the contract defines the “nature of the funding source” or clarifies when the nature of the funding source requires that the schools have title to the purchased property. The provision creates a certain amount of uncertainty on the issue of who owns the personal property used in the schools after the contracts have terminated. Did the funds used to purchase the personal property lose their public character once transferred to White Hat, a private entity?

Public Funds Paid to Private Entities

{¶ 31} In its first proposition of law, the schools seek a broad statement that public funds retain their character even after being paid to a private entity. R.C. 117.01(C) states that “public money” means “any money received, collected by, or due a public official under color of office, as well as any money collected by any individual on behalf of a public office or as a purported representative or agent of the public office.”
{¶ 32} Community schools are public schools. R.C. 3314.01(B); Cordray v. Internatl. Preparatory School, 128 Ohio St.3d 50, 2010-Ohio-6136, 941 N.E.2d 1170, ¶ 24. And as an entity established by the laws of this state for the exercise of a function of government, namely education, a community school is a public office. Id.; R.C. 117.01(D). We outlined the framework for determining “public official” status in Cordray, in which we decided that the treasurer of a community school was a public official obligated to account for and disburse public funds. We explained that a “public official” is “ ‘any officer, employee, or duly authorized representative or agent of a public office.’ ” Id. at ¶ 19, quoting R.C. 117.01(E). We then confirmed that any “duly authorized representative or agent” of a community school, therefore, is a “public official.” Id. at ¶ 24.
{¶ 33} The public funds received by a community school from the Department of Education are “received or collected” under color of office. Cordray, ¶ 27. When those funds are transferred directly to an operator, they are also public funds “received or collected” under color of office to the extent that those funds are used to perform a governmental function. While we cannot broadly hold that public funds always retain their status as public funds, a private entity such as White Hat engaged in the business of education is accountable for the manner in which it uses public funds. Free public education, whether provided by public or private actors, is historically an exclusively governmental function.
{¶ 34} The contracts contemplate that funds designated by the Ohio Department of Education for the education of public-school students will be used for the benefit of public schools and not their private operators. The personal property at issue in this case, which includes furniture, computers, software, and other *39 equipment, is essential for the schools to carry out the governmental function of providing an education to Ohio’s children. The notion that .the schools would knowingly transfer their funds to White Hat for White Hat to purchase the property for itself (and then later require the schools to buy the property back with additional public funds) does not seem supportable but was an agreed-upon term.
{¶ 35} We interpret the contract between the schools and White Hat as we interpret contracts between individuals, “ ‘with a view to ascertaining the intention of the parties and to give it effect accordingly, if that can be done consistently with the terms of the instrument.’ ” S & M Constructors, Inc. v. Columbus, 70 Ohio St.2d 69, 71, 434 N.E.2d 1349 (1982), quoting Hollerbach v. United States, 233 U.S. 165, 171-172, 34 S.Ct. 553, 58 L.Ed. 898 (1914). We have consistently explained that parties may contract for the terms they want and that the “intent of the parties is presumed to reside in the language they chose to use in their agreement.” Graham v. Drydock Coal Co., 76 Ohio St.3d 311, 313, 667 N.E.2d 949 (1996).
{¶ 36} Common words in a contract are given their plain and ordinary meaning, unless another meaning is clearly evident from the face or overall content of the contract, or unless the result is manifestly absurd. Alexander v. Buckeye Pipe Line Co., 53 Ohio St.2d 241, 374 N.E.2d 146 (1978), paragraph two of the syllabus. Courts apply clear and unambiguous contract provisions without regard to the relative advantages gained or hardships suffered by the parties. Dugan & Meyers Constr. Co., Inc. v. Ohio Dept. of Adm. Servs., 113 Ohio St.3d 226, 2007-Ohio-1687, 864 N.E.2d 68, ¶ 29, quoting Ohio Crane Co. v. Hicks, 110 Ohio St. 168, 172, 143 N.E. 388 (1924).
{¶ 37} “It is not the responsibility or function of this court to rewrite the parties’ contract in order to provide for a more equitable result. A contract ‘does not become ambiguous by reason of the fact that in its operation it will work a hardship upon one of the parties thereto.’ ” Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth., 78 Ohio St.3d 353, 362, 678 N.E.2d 519 (1997), quoting Ohio Crane Co. at 172. Unless there is “ ‘fraud or other unlawfulness involved, courts are powerless to save a competent person from the effects of his own voluntary agreement.’ ” Dugan & Meyers at ¶ 29, quoting Ullmann v. May, 147 Ohio St. 468, 476, 72 N.E.2d 63 (1947). The schools have not argued that the contracts were unconscionable, and we will not address issues not argued.
{¶ 38} The schools were represented by their own legal counsel, and they agreed to the provisions in the contracts. They may not rewrite terms simply because they now seem unfair. The contracts call for White Hat to title property in the schools’ name in one situation: “the Company shall purchase on behalf of *40 the School any furniture, computers, software, equipment, and other personal property which, by the nature of the funding source, must be titled in the School’s name.” Section 2.b.l. At the same time, the “property purchased by the School shall continue to be owned by the School.” Section 8.a.ii.
{¶ 39} So, if the nature of the funding source was such that White Hat was required to purchase the personal property in the schools’ names, that property belongs to the schools outright. But the contracts require additional payment from the schools if they wish to obtain the other personal property that White Hat purchased.

White Hat as a Fiduciary

{¶ 40} The schools contend that they should not have to pay anything to White Hat for the contested personal property, claiming that in agreeing to undertake the operation of the schools, White Hat assumed a fiduciary relationship to the schools. They urge that the broad authority conferred on White Hat by the contracts to act in key matters on behalf of the schools and its control of all functions of the schools’ day-to-day operations created a duty to act primarily for the benefit of the schools. The complaint alleges that the operators failed to account for the use of public funds. The complaint also alleges that White Hat improperly used public funds for other than educational purposes in violation of its fiduciary duty. White Hat, on the other hand, insists that the operators do not owe fiduciary duties, because they are not public officials. White Hat bases this argument on Section 14 of the contracts, which states that “[t]he parties hereby acknowledge that their relationship is that of an independent contractor.”
{¶ 41} We first note that the parties’ characterization of their relationship in the contracts is not controlling. Restatement of Agency 3d, Section 1.02; see N & G Constr., Inc. v. Lindley, 56 Ohio St.2d 415, 417, 384 N.E.2d 704 (1978), fn. 1.
{¶ 42} The contract between the schools and White Hat makes the operator the authorized representative of the community schools that it operates, for purposes of hiring, training, supervising, and firing staff, selecting a curriculum, purchasing equipment, maintaining academic standards, and monitoring student performance, either under the direction of the schools or subject to their approval. Clearly, pursuant to the contracts, White Hat is the “duly authorized representative” for the schools in a broad range of functions.
{¶ 43} We have defined the term “fiduciary relationship” as one “in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust.” In re Termination of Emp. of Pratt, 40 Ohio St.2d 107, 115, 321 N.E.2d 603 (1974). In determining whether a fiduciary relationship has been created, the main question is whether a party agreed to act primarily for the *41 benefit of another in matters connected with its undertaking. Strock v. Pressnell, 38 Ohio St.3d 207, 216, 527 N.E.2d 1235 (1988).
{¶ 44} In a recent and analogous case, a federal district court in Missouri held that a fiduciary relationship existed between a charter school’s board and its operator. Renaissance Academy for Math & Science of Missouri, Inc. v. Imagine Schools, Inc., W.D.Mo. No. 4:13-CV-00645-NKL, 2014 WL 7267033 (Dec. 18, 2014). Applying that state’s test for determining the existence of a fiduciary duty, the court concluded that a fiduciary relationship existed between the charter school and its operator. The court so held because under the terms of the operating agreement, the charter school’s board was required to give the operator virtually all money and property that the board received from taxpayers. Id. at *3. And without the board’s initial receipt of the money, the operator would not have had access to those funds. Id. The court found that the board placed its trust and confidence in its operator to create a successful learning environment and to manage the school’s operations. In short, the operator took over the de facto persona of the school’s governing authority. Id.
{¶ 45} Similarly, under Section 2 of the contracts, White Hat assumed broad authority, contracting with the schools to perform “all functions relating to the provision of the [relevant] Educational Model and the management and operation of the School in accordance with the terms of the Contract,” except for certain financial functions. Section 2.b.i. of the contracts makes the operators the purchasing agent for the schools in certain situations, authorizing the operators to make purchases “on behalf of’ the schools and to title property in the schools’ names. Certain crucial functions, such as staffing levels, recordkeeping, teacher training, and hiring and firing teachers, are entrusted to White Hat. White Hat agreed to act on behalf of the schools to help them carry out their purpose as outlined in R.C. Chapter 3314. White Hat’s purpose, reflected in the contracts, was to advance the schools’ interests. The schools contracted with White Hat to operate “all functions” of their day-to-day operations. It is evident that the schools have granted broad discretion to White Hat, placing special confidence and trust in the management companies and placing them in positions of superiority and influence. These are hallmarks of a fiduciary relationship. See Pratt at 115; Groob v. KeyBank, 108 Ohio St.3d 348, 2006-Ohio-1189, 843 N.E.2d 1170, ¶ 16.
{¶ 46} While it appears that a fiduciary relationship was created by the conduct of the parties, we cannot say whether a fiduciary duty was breached based on the record before us. The issue of unconscionability also invites further exploration in this case, but we may not consider issues not properly raised before us. The legislature has enacted statutes that take a laissez-faire attitude toward operators of community schools. We leave it to the General Assembly to determine *42 whether public policy requires stiffening of the regulatory scheme governing these matters.
Y. Conclusion
{¶ 47} We hold that an entity that manages the daily operations of a community school pursuant to a contract with the school’s governing authority is an “operator” within the meaning of R.C. 3314.02(A)(8)(a). We further hold that a management company that undertakes the daily operation of a community school has a fiduciary relationship with the community school that it operates. That fiduciary relationship between an operator and its community school is implicated when the company uses public funds to purchase personal property for use in the school that it operates.
{¶ 48} We therefore affirm the judgment of the Tenth District Court of Appeals to the extent that it held that the buy-back provision of the contracts was enforceable and that the schools are obliged under that provision to pay for the personal property purchased by White Hat as described in the contract. We reverse the portion of the judgment of the Tenth District Court of Appeals on the issue of the existence of a fiduciary relationship between the parties. This case is remanded to the trial court for an inventory of the property and its disposition according to the contract terms.
Judgment affirmed in part and reversed in part, and cause remanded.
O’Connor, C.J., and Wise, J., concur in syllabus and judgment only.
Kennedy and French, JJ., concur in judgment in part and dissent in part and concur in paragraph one of the syllabus.
O’Neill, J., concurs in the syllabus but dissents from the opinion and judgment.
Pfeifer, J., dissents.
John W. Wise, J., of the Fifth Appellate District, sitting for O’Donnell, J.

. Appellants are the governing authorities of Hope Academy Broadway Campus, Hope Academy Chapelside Campus, Hope Academy Lincoln Park Campus, Hope Academy Cathedral Campus, Hope Academy University Campus, Hope Academy Broad Street Campus, Life Skills Center of Cleveland, Life Skills Center of Akron, Hope Academy West Campus, and Life Skills Center Lake Erie.

. Appellees are White Hat Management, L.L.C.; WHLS of Ohio, L.L.C.; HA Broadway, L.L.C.; HA Chapelside, L.L.C.; HA Lincoln Park, L.L.C.; HA University, L.L.C.; HA Cathedral, L.L.C.; HA High Street, L.L.C.; HA Brown Street, L.L.C.; LS Cleveland, L.L.C.; LS Akron, L.L.C.; HA West, L.L.C.; and LS Lake Erie, L.L.C.

. White Hat also appealed several discovery rulings to the Tenth District Court of Appeals. See Hope Academy Broadway Campus v. White Hat Mgt., L.L.C., 10th Dist. Franklin No. 12AP-116, 2013-Ohio-911, 2013 WL 987942. We declined to accept White Hat’s discretionary appeal from the Tenth District’s decision. 136 Ohio St.3d 1452, 2013-Ohio-3210, 991 N.E.2d 258.

. 2015 Sub.H.B. No. 2.

. See, e.g., R.C. 3314.05(B)(2)(a) (referring to contracts between operators and governing authorities); 3314.026 (outlining method for terminating operator contracts); and 3314.092 (setting forth duty of operator to consult with school district regarding transportation before revising school schedules).

. “Personal property” is defined as “[a]ny movable or intangible thing that is subject to ownership and not classified as real property.” Black’s Law Dictionary 1412 (10th Ed.2014).