[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-15504
Non-Argument Calendar
_____

D.C. Docket No. 1:15-cv-00800-RWS

L. BRIAN ALEXANDER,

                                        Plaintiff - Appellee,

versus

AGILYSYS INC,

                                        Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(June 13, 2017)

Before HULL, WILSON, and JILL PRYOR, Circuit Judges.

PER CURIAM:

Agilysys Inc. appeals the district court's grant of summary judgment to its former employee, L. Brian Alexander, on Alexander's claim that Agilysys breached his employment agreement by declining to pay Alexander severance after his division was sold to another company.  On appeal, Agilysys argues that the district court incorrectly defined the word "termination" in the employment agreement and alternatively improperly weighed competing evidence in concluding that Alexander was owed severance pay.  Because the latter argument is meritorious, we reverse the district court's grant of summary judgment to Alexander and remand for proceedings consistent with this opinion.

## I.    BACKGROUND

Alexander started working at Agilysys in 2003 in its Retail Service Group ("RSG").  By 2013, his title was Vice President of Service Delivery.  In 2007, Alexander and Agilysys entered into an employment agreement, paragraph 5.B of which noted:

> Termination Without Cause.  If your employment is terminated by Agilysys for any reason other than those identified in Paragraph 5.A, above, then you will be paid a severance . . . equal to one (1) year regular base and target incentive salary (if applicable), which will be at the rate applicable to you at the time your employment terminates and will be paid during regular pay intervals during the one (1) year period. . . . in case of termination without Cause, you will be eligible to continue to participate in applicable medical and dental coverage program(s) available to Agilysys employees for the duration of the Severance Period.  You will not otherwise be eligible for severance under any Agilysys severance plan.

2

Employment Agreement, Doc. 59-1 at 3.[1]  Paragraph 5.A of the agreement noted that "[i]f . . . you voluntarily resign your employment, then your salary will end on the Termination Date."  *Id.*  Agilysys presented the agreement—which was materially identical to agreements presented to other employees in the Retail Sales Group—to Alexander, who signed without making changes.

The employment agreement permitted Agilysys to assign it to another employer without Alexander's consent:

> This agreement may be assigned by Agilysys, without your consent, to a third party ("Assignee") in connection with the sale or transfer of all or substantially all of Agilysys' business, or any division or unit thereof, whether by way of sale of stock, sale of assets, merger or other transaction.  Such assignment by Agilysys will not constitute nor be deemed a termination of your employment by Agilysys, and will not give rise to any rights under Paragraph 5 of this Agreement.

Employment Agreement, Doc. 59-1 at 5-6.

In 2012, Agilysys initiated a sale of the RSG.  Alexander was involved in the sale, traveling around the country to make presentations to potential buyers.  Alexander testified that the sale was largely for the current employees of the group—specifically the management team, of which he was a part—rather than any tangible assets.  The RSG was eventually sold to Kyrus Solutions, Inc.  Although Alexander's employment agreement was freely assignable, it was not assigned to Kyrus in the sale.  As part of the sale to Kyrus, Agilysys agreed that it

---

[1] Citations to "Doc. __" refer to numbered docket entries in the district court record in this case.

would cooperate with Kyrus in its efforts to hire Agilysys's employees. In doing so, Agilysys offered Alexander a retention bonus if he agreed to remain with Agilysys until the sale, which Alexander accepted.

Agilysys circulated to its employees a question and answer document concerning the sale of the RSG. In discussing whether there would be layoffs as a result of the sale, the document noted: "Some Corporate positions will be impacted. We have communicated with those employees whose job is affected as a result of the sale. If you haven't had a discussion with our manager then your job is not impacted as a result of the sale." Sale Q&A Sheet, Doc. 57-3 at 31. Though Agilysys's corporate representative testified that Alexander's supervisor, Paul Civils, was supposed to explain to Alexander the status of his employment agreement after the sale, Civils explained that he was unaware that he had any such responsibility. Alexander joined Kyrus upon completion of the sale, continuing in roughly the same position that he held as Agilysys. According to Alexander, he was "directed to" work for Kyrus by Agilysys. Alexander Dep., Doc. 54 at 43. Nonetheless, Alexander refused to sign an employment agreement with Kyrus because he was under the mistaken impression that his employment agreement with Agilysys had been assigned to Kyrus.

Alexander neither expressed interest in remaining with Agilysys after the sale, nor did Agilysys offer him any such position. According to Agilysys's

4

corporate representative, had Alexander expressed an interest in staying, it would have "led to a conversation to assess if there was an opportunity" for Alexander at Agilysys. Seebeck Dep., Doc. 53-4 at 28. The representative further explained that because Alexander was "very good at his job," she "would have seen if there was something we could have done" to keep Alexander at Agilysys. *Id.* at 71-72. The representative testified that had Alexander indicated that he wanted to stay with Agilysys, he would have at least been permitted to stay on for a limited period of time under a Transition Services Agreement ("TSA"). Under the TSA, Alexander would have remained an Agilysys employee for up to six months after the sale of the RSG to Kyrus. Nonetheless, there is no indication that any Agilysys employee ever told Alexander that remaining with Agilysys under the TSA was an option.

Alexander discovered information leading him to believe that the RSG management's employment contracts had not been assigned to Kyrus in the sale. He subsequently filed suit against Agilysys for breach of contract, alleging that he was entitled to severance pay under his employment agreement. The district court granted summary judgment to Alexander. Agilysys now appeals.

## II.    STANDARD OF REVIEW

"This court reviews a district court's grant of summary judgement de novo, applying the same legal standards used by the district court." *Galvez v. Bruce*, 552

F.3d 1238, 1241 (11th Cir. 2008).  We view the facts in the light most favorable to the nonmoving party.  *See id.*  We must also draw "all reasonable inferences in favor of the party opposing summary judgment."  *Whatley v. CNA Ins. Cos.*, 189 F.3d 1310, 1313 (11th Cir. 1999).  Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Mere speculation is insufficient to create a genuine issue of material fact.  *See Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).

## III.  DISCUSSION

The parties agree that Ohio law governs this dispute.  "In a breach-of-contract action, the plaintiff must show the existence of a contract, performance (or readiness and willingness to perform) by the plaintiff, failure to perform by the defendant, and damages."  *Galmish v. Cicchini*, 734 N.E.2d 782, 795 (Ohio 2000).  At issue on appeal is the district court's determination on summary judgment that Agilysys failed to perform pursuant to the employment agreement by refusing to pay severance to Alexander.

Agilysys makes two arguments on appeal.  First, Agilysys asserts that the district court misinterpreted the word "termination" in the employment agreement.  Second, Agilysys argues that even if the district court properly defined

6

"termination," it still erred by improperly weighing evidence to conclude that Alexander did not voluntarily leave Agilysys.  We address each argument in turn.

Agilysys argues that the district court erred in finding that Alexander was "terminated" within the meaning of the employment agreement.  According to Agilysys, "termination" means "the act of firing or dismissing someone," or "the act of making a person leave a job."  Appellant's Br. at 6.  Consequently, in Agilysys's view, it owes no severance to Alexander under the employment agreement—under which severance payment is triggered if Alexander is "terminated by Agilysys" without cause—because it did not "fire" Alexander in the traditional sense, and Alexander suffered no lapse in employment.  By contrast, Alexander maintains that "termination" includes any separation between Agilysys and Alexander, regardless of whether the separation is voluntary or involuntary on Alexander's part.  The district court concluded that "termination" was ambiguous and resolved the ambiguity in favor of Alexander.

It is an "established principle of contract interpretation that [c]ontracts are to be interpreted so as to carry out the intent of the parties, as that intent is evidenced by the contractual language." *Lutz v. Chesapeake Appalachia, L.L.C.*, 71 N.E.3d 1010, 1012 (Ohio 2016) (internal quotation marks omitted).  When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties. *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261

7

(Ohio 2003).  We conclude that the district court correctly defined "termination" under the employment agreement, but it erred in concluding that the term is ambiguous.

The four corners of the employment agreement demonstrate that the meaning of "termination" is  unambiguous and that it comports with Alexander's view that a termination refers to any separation between Alexander and Agilysys, regardless of reason.  "Termination" and its variations are used repeatedly throughout the employment agreement.  Paragraph 5.A of the employment agreement is labeled "Termination for Cause and Voluntary Termination."  It proceeds to list a number of reasons that Alexander's employment might "terminate," including death, disability, legal incompetence, for cause by Agilysys, and voluntary resignation.  Employment Agreement, Doc. 59-1 at 3.  A "termination" is therefore broader than a traditional firing; indeed, it would be nonsensical to say that an employee was fired by Agilysys where, in reality, the employee died or voluntarily resigned.  *See Hope Acad. Broadway Campus v. White Hat Mgmt., L.L.C.*, 46 N.E.3d 665, 674-75 (Ohio 2015) (counseling against interpretation of a contract that would lead to a "result [that] is manifestly absurd.").  Moreover, paragraph 6 of the employment agreement notes that Alexander is obligated to return confidential information to Agilysys "upon termination of [his] employment."  Under Agilysys's interpretation of

"termination," Alexander would owe Agilysys its confidential information back only if he were fired and not if, say, he voluntarily resigned and immediately started working for a competitor. It seems dubious that this is what Agilysys bargained for. Nor does the employment agreement give any indication that "termination" means something different in paragraph 5.B—the provision at issue—than it does in the rest of the contract. Consequently, it is unambiguous that under the employment agreement, "termination" refers to any separation between Alexander and Agilysys, regardless of the reason for the separation.

The question then becomes: Was Alexander terminated "by Agilysys"—such that he is owed severance, because the parties agree that his termination was not for cause—or was his termination voluntary? The district court concluded that because Agilysys sold the RSG to Kyrus, it "constructively terminated" Alexander and therefore owed him severance. This was error.

Viewing the facts in the light most favorable to—and drawing all inferences in favor of—Agilysys, a reasonable jury could find that Alexander voluntarily left Agilysys. The record contains evidence indicating that (1) Alexander was heavily involved in the sale of the RSG to Kyrus, actively advertising the RSG management team—himself included—to potential buyers; (2) Alexander never expressed interest in remaining with Agilysys after the sale; (3) had Alexander expressed interest in remaining at Agilysys after the sale, he would have had an

9

opportunity to do so under the TSA at least for some period of time; (4) even absent the TSA, Agilysys would have searched for a position for Alexander; and (5) despite the question and answer leaflet indicating that employees would be told if their job at Agilysys was affected by the sale of the RSG to Kyrus, no one at Agilysys told Alexander that he would be laid off from Agilysys. This evidence would permit a reasonable jury to infer that Alexander voluntarily terminated his employment at Agilysys.[2]

Alexander argues that *Bolling v. Clevepak Corp.*, 484 N.E.2d 1367 (Ohio Ct. App. 1984), compels the conclusion that Alexander is entitled to severance pay under the employment agreement. We disagree. In *Bolling*, employees of a box plant sued their former employer, Clevepak, for severance after Clevepak sold the plant to another company that continued to employ each of the plaintiffs. *Id.* at 1370-72. The Ohio Court of Appeals determined that the employees were owed severance pay pursuant to Clevepak's employee manual, under which a "separation for reasons other than cause" triggered Clevepak's severance obligation. *Id.* at 1371. In doing so, the court concluded that a "separation" triggered Clevepak's

---

[2] Alexander argues that the record lacks evidence that he would have been offered a comparable position had he expressed interest in remaining at Agilysys. Alexander alternatively argues that any position that Agilysys could have given him would also have triggered a severance payment under a separate clause of the employment agreement. But the operative question is not whether Alexander would have been entitled to severance in counterfactual scenarios; the question is whether Alexander's actual departure from Agilysys was voluntary. That Alexander expressed no interest in remaining at Agilysys and made no effort to learn of other opportunities there is evidence that his termination was voluntary.

10

severance obligation and that Clevepak affected a separation by selling the plant. *Id*. at 1376-77.

Unlike this case, however, there was no assertion made in *Bolling* that the employees' separation from Clevepak was voluntary. Here, by contrast, there is evidence supporting the conclusion that Alexander voluntarily left Agilysys for Kyrus. We do not quibble with the idea that in many situations the sale of a company or unit may trigger a severance obligation under an employment agreement. But the operative question is whether that obligation was triggered under the specific circumstances and employment agreement at issue here. *Bolling* fails to answer that question. *See also Bedinghaus v. Modern Graphic Arts*, 15 F.3d 1027, 1030 (11th Cir. 1994) (holding that employees of a company sold to a new owner were entitled to severance pay under a plan governed by ERISA where "there [wa]s no genuine dispute that plaintiffs' terminations were involuntary . . . [because the plaintiffs] were to choose either resignation or employment with [the purchaser]" (alteration omitted)). The record in this case supports two plausible inferences: that Alexander's termination was voluntary and that Alexander was terminated by Agilysys without cause. The district court therefore erred in granting summary judgment to Alexander. *See Pioch v. IBEX Eng'g Servs., Inc.*, 825 F.3d 1264, 1267 (11th Cir. 2016) ("If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary

judgment." (internal quotation marks omitted)); *see also Cook Indus., Inc. v. Cmty. Grain, Inc.*, 614 F.2d 978, 980 (5th Cir. 1980) ("Although the interpretation of a contract is normally a question of law for the Court, that interpretation frequently depends heavily on the resolution of factual disputes.  And it is the function of the trier of fact to resolve such factual disputes.").[3]

## IV.    CONCLUSION

For the foregoing reasons, we reverse district court's grant of summary judgment to Alexander and remand for proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

---

[3] Decisions of the former Fifth Circuit rendered prior to close of business on September 30, 1981 are binding on this Court.  *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).