[**Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Willoughby Hills Dev. & Distrib., Inc. v. Testa,* **Slip Opinion No. 2018-Ohio-4488.**]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2018-OHIO-4488

WILLOUGHBY HILLS DEVELOPMENT AND DISTRIBUTION, INC., APPELLANT, *v.* TESTA, TAX COMMR., APPELLEE.

[**Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Willoughby Hills Dev. & Distrib., Inc. v. Testa,* **Slip Opinion No. 2018-Ohio-4488.**]

*Commercial-activity tax—Gross receipts—Gasoline distributor not eligible for gross-receipts exclusion from commercial-activity tax under R.C. 5751.01(F)(2)(l) because it was not acting as agent of manufacturer/supplier when selling gasoline to retailers—Board of Tax Appeals' decision affirmed.*

(No. 2016-1137—Submitted June 26, 2018—Decided November 7, 2018.)

APPEAL from the Board of Tax Appeals, No. 2015-1069.

————————————

**Per Curiam.**

{¶ 1} Appellant, Willoughby Hills Development and Distribution, Inc. ("WHDD"), appeals a Board of Tax Appeals ("BTA") decision that affirmed appellee tax commissioner's denial of WHDD's request for a commercial-activity-

tax ("CAT") refund. Subject to certain exclusions, the CAT is levied on each person or entity with taxable gross receipts above a certain threshold for the privilege of doing business in Ohio. *See* R.C. 5751.01 et seq. The issue here involves whether WHDD can meet the requirements of a gross-receipts exclusion that applies when a person or entity acts as an agent for another. We conclude that WHDD falls short of the requirements necessary for the exclusion to apply, and we accordingly affirm the BTA's decision.

## FACTS AND PROCEDURAL BACKGROUND

**{¶ 2}** WHDD is a Wickliffe-area distributor engaged in the business of purchasing and reselling gasoline to retailers located throughout northern Ohio. WHDD's purchasing activities with Sunoco, Inc. (R&M) ("Sunoco") and its reselling activities with retailer Sopinski Enterprises, Inc. ("Sopinski") lie at the heart of this appeal.

*The Sunoco agreement*

**{¶ 3}** In 2004, WHDD negotiated an agreement with Sunoco under which Sunoco agreed to sell and WHDD agreed to purchase a Sunoco product styled "branded motor fuel," a term referring to gasoline that Sunoco manufactures/supplies and delivers for purposes of resale under trademarks, trade names, and trade dress in which Sunoco has exclusive rights. We will refer to Sunoco's bundle of trademarks, trade names, and trade dress as its "intangible assets."

**{¶ 4}** The agreement's initial term was for ten years, commencing January 1, 2004, and ending December 31, 2014. For each year, the agreement specifies the volume of gasoline that WHDD would purchase from Sunoco. WHDD's purchasing volume generally increased over those ten years, with WHDD agreeing to purchase 11.5 billion gallons in year one and 15.5 billion gallons in year ten. The parties elected not to fix WHDD's purchase price; instead, WHDD was to pay the

price in effect at the time and place of delivery—WHDD refers to this as a type of "open price term" contemplated by R.C. 1302.18.

{¶ 5} WHDD and Sunoco agreed that WHDD's purchase and resale of gasoline to retailers consistently with Sunoco's brand and image requirements formed the "essence" of their agreement. To this end, their agreement memorializes WHDD's understanding of the "importance of the image conveyed to the public" by retailers that are authorized to use Sunoco's intangible assets. Sunoco subjects those retailers to minimum standards and requirements that are set forth in a Sunoco image-standard manual. For example, the building, poles, and curbs located at each retailer's premises must be painted in Sunoco-approved colors.

{¶ 6} The agreement denominates WHDD as an independent contractor and forbids WHDD to act as Sunoco's agent or employee. Additionally, the agreement provides that WHDD may not "make any commitments or incur any expense or obligations of any kind on behalf of" Sunoco in the absence of Sunoco's approval.

*The Sopinski agreement*

{¶ 7} In 2009, WHDD negotiated an agreement with Sopinski, a retailer, entitled "Product Sales Agreement." This is the only agreement in the record between WHDD and a retailer; however, the parties have treated it as representative of WHDD's contractual relationships with other retailers.

{¶ 8} Under the agreement, Sopinski agreed to purchase its requirements of gasoline from WHDD. The agreement spans 15 years, commencing June 1, 2009, and ending May 31, 2024. Over this term, Sopinski obliged itself to purchase 33.375 million gallons of gasoline from WHDD. Sopinski agreed to pay the price that Sunoco charged to WHDD, subject to various upward adjustments. The agreement bars WHDD from "direct[ing] or control[ling]" Sopinski's operations and employees.

*Proceedings before the tax commissioner*

**{¶ 9}** WHDD filed returns and paid taxes pursuant to the CAT statute. Thereafter, in January 2012, WHDD filed with the tax commissioner an application for a CAT refund, *see* R.C. 5751.08, in the amount of $417,228 for the period October 2007 through September 2011. WHDD predicated its refund claim on an alleged agency relationship with Sunoco. The tax commissioner, however, determined that no agency relationship existed and accordingly denied the claim. The tax commissioner based his decision in significant part on the language of the Sunoco agreement that describes WHDD as an independent contractor that lacks authority to act as Sunoco's agent. The tax commissioner rejected the contention that Sunoco exercised sufficient control over WHDD such that it elevated their relationship to one of principal and agent, noting that Sunoco did not place supervisors or managers on WHDD's premises to monitor WHDD's work.

*BTA proceedings*

**{¶ 10}** WHDD appealed to the BTA, where its counsel asserted that WHDD should be deemed the agent of Sunoco because of what WHDD viewed as its responsibility to protect Sunoco's intangible assets when they are used by retailers such as Sopinski. WHDD presented testimony from Tony Continenza, WHDD's operation director, who testified that Sunoco instructs WHDD concerning the implementation at retail sites of credit-card programs, imaging operations, uniform protocols, and color schemes. He further explained that WHDD's distributorship is exclusive to Sunoco and that all of WHDD's relationships with retailers are memorialized in written agreements. No one from Sunoco or from any retailer appeared to testify.

**{¶ 11}** The BTA affirmed the tax commissioner's final determination, finding no agency relationship between WHDD and Sunoco. The BTA determined that WHDD was not acting on behalf of Sunoco when WHDD sold gasoline to retailers; rather, the BTA observed, the sales were made between WHDD and

retailers in accord with their respective sales agreements. The BTA further determined that Sunoco did not exercise sufficient control over WHDD's operations for WHDD to be its agent and that WHDD offered no evidence to justify the disregard of its agreement with Sunoco forbidding it to act as Sunoco's agent. WHDD then filed this appeal.

## STANDARD OF REVIEW

{¶ 12} We will affirm a BTA decision that is reasonable and lawful. *Satullo v. Wilkins*, 111 Ohio St.3d 399, 2006-Ohio-5856, 856 N.E.2d 954, ¶ 14. We apply de novo review to the BTA's resolution of legal questions. *Crown Communication, Inc. v. Testa*, 136 Ohio St.3d 209, 2013-Ohio-3126, 992 N.E.2d 1135, ¶ 16. But the BTA's findings concerning the weight of the evidence receive deference if there is record support for them. *Kinnear Rd. Redevelopment, L.L.C. v. Testa*, 151 Ohio St.3d 540, 2017-Ohio-8816, 90 N.E.3d 926, ¶ 14.

## DISCUSSION

### *The CAT*

{¶ 13} The CAT is "levied * * * on each person with taxable gross receipts for the privilege of doing business in this state." R.C. 5751.02(A); *see also* R.C. 5751.01(A) (defining "person" for purposes of CAT statute as including companies "and any other entities"). "[G]ross receipts" is defined as "the total amount realized by a person, without deduction for the cost of goods sold or other expenses incurred, that contributes to the production of gross income of the person, including the fair market value of any property and any services received, and any debt transferred or forgiven as consideration." R.C. 5751.01(F). As an example, "gross receipts" includes "[a]mounts realized from the sale, exchange, or other disposition of the taxpayer's property to or with another." R.C. 5751.01(F)(1)(a).

{¶ 14} In spite of its broad sweep, the term "gross receipts" is not without limits. One limitation is that "[p]roperty, money, and other amounts received or acquired by an agent on behalf of another in excess of the agent's commission, fee,

or other remuneration" are excluded from "gross receipts." R.C. 5751.01(F)(2)(l). An "[a]gent" is "a person authorized by another person to act on its behalf to undertake a transaction for the other," R.C. 5751.01(P), and includes "[a] person retaining only a commission from a transaction with the other proceeds from the transaction being remitted to another person," R.C. 5751.01(P)(2).[1]

*Which of WHDD's activities matter for the purpose of determining whether it is an agent of Sunoco under the CAT?*

{¶ 15} Before determining whether WHDD is an agent of Sunoco, we address an antecedent question: which of WHDD's activities matter for the purpose of determining whether it is an agent under the CAT statute?

{¶ 16} WHDD's argument that it is Sunoco's agent rests on the claim that it is responsible for managing and protecting Sunoco's intangible assets. WHDD points to language in its agreement with Sunoco that directs it to "use [its] best efforts to require [its] Retailers to operate retail locations identified with [Sunoco's intangible assets]" in a manner consistent with Sunoco's "minimum requirements as to product offering, image, appearance and service." At the BTA hearing, Continenza fleshed out aspects of this directive. He discussed a Sunoco manual that prescribes, among other things, the proper placement of logos, signs, and stickers at retail sites. Continenza explained that Sunoco "hold[s] us, [WHDD], directly responsible for complete imaging of that station." If WHDD or a retailer served by WHDD fails to comply with Sunoco's "minimum image standards and requirements," WHDD shall be deemed "noncomplian[t] with a material provision" of the agreement.

---

[1] The tax commissioner has adopted a rule interpreting R.C. 5751.01(P)'s definition of "agent." *See* Ohio Adm.Code 5703-29-13. But the tax commissioner's brief does not urge us to apply the rule, and WHDD's brief asserts that it does not apply. Given the absence of adversarial briefing on the rule, we decline to address it. *See Sizemore v. Smith*, 6 Ohio St.3d 330, 333, 453 N.E.2d 632 (1983), fn. 2.

**{¶ 17}** The tax commissioner, on the other hand, claims that these activities have nothing to do with WHDD's generation of gross receipts. According to the tax commissioner, the focal point should instead be on WHDD's sales of gasoline to retailers as viewed through the lens of R.C. 5751.01(F)(1)(a).

**{¶ 18}** We agree with the tax commissioner. R.C. 5751.01(F)(1)(a) provides that "gross receipts" includes "[a]mounts realized from the sale, exchange, or other disposition of the taxpayer's property to or with another." Thus, WHDD's computation of gross receipts must include the amounts it realizes from selling its property to another. Here, under the section of WHDD's contract with Sopinski entitled "Purchase and Sale of Products," WHDD agreed to "sell" gasoline and Sopinski agreed to "purchase and pay" WHDD for that gasoline. Given this clause, if WHDD was selling its own gasoline to Sopinski rather than someone else's, then the amounts realized from selling this gasoline are includable as WHDD's gross receipts. The terms of WHDD's contract with Sunoco confirm that WHDD was selling its own gasoline to Sopinski. In the contract's preamble, Sunoco agreed that it would "sell" and WHDD agreed that it would "purchase" Sunoco's gasoline. And under the section of the contract entitled "Delivery and Receipt of Products," WHDD agreed to take title to and accept the risk of loss on the gasoline upon delivery by Sunoco.[2] In taking title, WHDD acquired "the legal right to control and dispose of property," *Black's Law Dictionary* 1712 (10th Ed.2014).

**{¶ 19}** WHDD stresses that its agreement with Sunoco states that WHDD's purchase and resale of Sunoco's gasoline "consistent with [Sunoco]'s standards and image requirements, is the essence of this Agreement." An essence provision in a

---

[2] WHDD apparently seeks to discount the import of this clause, asserting that "[t]hough the Distributor Agreement [with Sunoco] states that WHDD takes title to the gasoline, WHDD's agreement with [Sopinski] states that title passes to the retail station at the Sunoco loading facility." That argument is a reference to a passage in the Sopinski agreement stating that the gasoline "shall be delivered to [Sopinski] F.O.B." at the loading facility. But it is not clear why the passage of title to Sopinski at the loading facility (as opposed to somewhere else) should matter for CAT purposes, and in any event, WHDD does not develop an argument to show why it should.

contract is generally understood to convey that a contractual requirement is "so important that if the requirement is not met, the promisor will be held to have breached the contract and a rescission by the promisee will be justified." *Id.* at 1260. But while an essence provision may empower a party to rescind on a contract, it does not define the scope of a tax statute, a central inquiry here.

{¶ 20} WHDD next claims that the price that it pays to Sunoco for the gasoline it resells to retailers encompasses the services it provides for Sunoco (i.e., managing and protecting Sunoco's intangible assets). WHDD's contract with Sunoco belies this theory—the contract speaks to sales of gasoline, not sales of services. And WHDD points to nothing else in the record to controvert the contract's plain terms. *See Sunoco, Inc. (R&M) v. Toledo Edison Co.*, 129 Ohio St.3d 397, 2011-Ohio-2720, 953 N.E.2d 285, ¶ 37 ("When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties").

{¶ 21} Another version of WHDD's argument asserts that the gasoline and the intangible assets should be treated as one product. In support of this argument, WHDD cites two federal-court decisions, *Hamro v. Shell Oil Co.*, 674 F.2d 784, 787-788 (9th Cir.1982), and *Smith v. Mobil Oil Corp.*, 667 F.Supp. 1314, 1328 (W.D.Mo.1987), in which the courts determined that gasoline and the trademark identifying the gasoline should not be viewed as separate products for the purpose of a tying claim under antitrust law. The focal point here, however, is not on how best to understand the attributes of a particular product in the context of a tying claim; rather, it is on what actions should count when assessing whether one is an agent for CAT purposes. WHDD claims that its actions of superintending Sunoco's intangible assets against retailers provide the polestar of that inquiry. But *Hamro* and *Smith*, with their product-based focus, have nothing to say about that inquiry.

{¶ 22} In sum, if WHDD is to benefit from the gross-receipts exclusion that applies to agents, WHDD's entitlement to that exclusion must turn on its acts of

purchasing and selling gasoline, not on its responsibilities associated with managing and protecting Sunoco's intangible assets.

*Does WHDD meet the CAT statute's definition of "agent"?*

**{¶ 23}** Under the CAT statute, an "[a]gent" is "a person authorized by another person to act on its behalf to undertake a transaction for the other." R.C. 5751.01(P). Because "agent" is defined by statute, WHDD must meet the definition's requirements. *See Good Samaritan Hosp. of Dayton v. Porterfield*, 29 Ohio St.2d 25, 30, 278 N.E.2d 26 (1972) ("Where a statute defines terms used therein, such definition controls in the application of the statute * * *"); *Gardner Plumbing, Inc. v. Cottrill*, 44 Ohio St.2d 111, 115, 338 N.E.2d 757 (1975) (party who asserts the existence of an agency relationship shoulders the burden of proving it).

**{¶ 24}** The first condition that must be met under the statute is that the "agent" be a "person authorized" to act on another's behalf. R.C. 5751.01(P). In other words, the person must be "endowed with authority." *Webster's Third New International Dictionary* 147 (2002) (defining "authorized"). As we explained above, that authority should be linked to WHDD's gasoline dealings.

**{¶ 25}** Authority is a concept with different shades of meaning. *Compare State v. Billingsley*, 133 Ohio St.3d 277, 2012-Ohio-4307, 978 N.E.2d 135, ¶ 26 (discussing apparent authority) *with Damon's Missouri, Inc. v. Davis*, 63 Ohio St.3d 605, 608, 590 N.E.2d 254 (1992) (discussing actual authority). The CAT statute does not define the type of authority that must be bestowed on a person or entity to create an agency relationship for CAT purposes. But authority is a concept the roots of which may be traced to the common law of agency, *Kerans v. Porter Paint Co.*, 61 Ohio St.3d 486, 498, 575 N.E.2d 428 (1991) (Holmes, J., dissenting), and common-law understandings of this term thus provide proper indicia of statutory meaning, Scalia & Garner, *Reading Law: The Interpretation of Legal*

*Texts* 320 (2012) ("A statute that uses a common-law term, without defining it, adopts its common-law meaning" [boldface omitted]).[3]

{¶ 26} In *Cincinnati Golf Mgt., Inc. v. Testa*, 132 Ohio St.3d 299, 2012-Ohio-2846, 971 N.E.2d 929, we analyzed the issue of authority in deciding a question of agency in a sales-and-use-tax case. There, a company in charge of managing a city's golf courses claimed that it was acting as the city's agent when the company made certain purchases from vendors in the course of performing its management duties. In the company's view, this alleged agency relationship rendered the purchases nontaxable under an exemption provision for sales to political subdivisions.

{¶ 27} The relevant statutes did not provide an answer to the question, so we looked to common-law understandings embodied in the case law and the Restatement. Based on those sources, we observed that the proper inquiry should center on whether the company had *actual authority* to bind the city to the company's purchases, *id.* at ¶ 23-24, and that that issue should turn on the language of the company's management contract with the city, *id.* at ¶ 25. "[O]ne of the most important features of the agency relationship is that *the principal itself becomes a party* to contracts that are made on its behalf by the agent" (emphasis sic), *id.* at ¶ 23, and "that the agent make the contracts on the principal's behalf *with actual authority to do so*" (emphasis sic), *id.* at ¶ 24. Paraphrasing the Restatement, we described actual authority as "an expression of intent by the principal that the agent act on behalf of the principal, along with the understanding of the agent." *Id.*, citing 1 Restatement of the Law 3d, Agency, Section 3.01. Applying these principles, we concluded that the company was not endowed with actual authority to bind the city

---

[3] While R.C. 5751.01(K) provides that "[a]ny term used in this chapter that is not otherwise defined has the same meaning as when used in a comparable context in the laws of the United States relating to federal income taxes unless a different meaning is clearly required," the parties do not identify any provision of federal-income-tax law that sheds light on how to discern the meaning of authority within the confines of agency principles.

to the company's purchases, because the contract between the company and the city expressly disclaimed an agency relationship. *Id.* at ¶ 25.

{¶ 28} This case parts ways from *Cincinnati Golf Mgt.* insofar as it does not involve an exemption provision relating to sales-and-use-tax law but, rather, an exclusion relating to the CAT. But that difference is immaterial. In *Cincinnati Golf Mgt.*, we concluded that "the issue before us concerns the agency doctrine of authority." *Id.* at ¶ 23. And here, the primacy of a putative agent's authority to act for another arises by virtue of R.C. 5751.01(P)'s definition of "agent," which uses the term "authorized" to modify "person." Because the meaning of "authority" derives from agency principles, not from the definition of a particular tax statute, there is no impediment to applying the logic of *Cincinnati Golf Mgt.* to the questions raised here.

{¶ 29} Turning to WHDD's contracts, a key set of clauses weigh in favor of concluding that WHDD was not acting as Sunoco's agent when it sold gasoline to retailers. First, the Sunoco contract provides that WHDD "is an independent contractor" and "is not authorized to act as an agent * * * of [Sunoco]." While labels used in a contract are not controlling, *Hope Academy Broadway Campus v. White Hat Mgt., L.L.C.*, 145 Ohio St.3d 29, 2015-Ohio-3716, 46 N.E.3d 665, ¶ 41 (lead opinion), that provision is hardly "an expression of intent by the principal that the agent act on behalf of the principal," *Cincinnati Golf Mgt.*, 132 Ohio St.3d 299, 2012-Ohio-2846, 971 N.E.2d 929, at ¶ 24. Second, that contract provides that WHDD "is not authorized * * * to make any commitments or incur any expense or obligations of any kind on behalf of [Sunoco]" unless Sunoco gives its approval. That provision marks a departure from "one of the most important features," *id.* at ¶ 23, of an agency relationship, by in effect precluding WHDD, in the absence of Sunoco's approval, from binding Sunoco to WHDD's sales contracts with retailers. And notably, WHDD has not pointed to anything in the record showing that Sunoco has elsewhere granted such approval. The Sopinski contract reinforces the divide

that exists between WHDD and Sunoco. It denominates WHDD—not Sunoco—as the seller of gasoline; indeed, Sunoco is not a party to that contract.

{¶ 30} In addition, WHDD was not "act[ing] on [another's] behalf," R.C. 5751.01(P). "A purchaser is not 'acting on behalf of' a supplier in a distribution relationship in which goods are purchased from the supplier for resale. A purchaser who resells goods supplied by another is acting as a principal, not an agent." 1 Restatement of the Law 3d, Agency, Section 1.01, at 30 (2006). Thus, WHDD was not acting as Sunoco's agent when it sold gasoline to retailers; instead, it was acting as a principal for its own benefit.

{¶ 31} *Fischer v. Havelock*, 134 Cal.App. 584, 25 P.2d 864 (1933), a tort-liability decision cited by WHDD, does not require a different result. In that case, the court found that a distributor of gasoline was the agent of the supplier, in part because the distributor never purchased the gasoline from the supplier. *Id.* at 588. Here, however, WHDD's contract with Sunoco plainly contemplates that WHDD purchase and take title to the gasoline.

*Does the control test inform the agency analysis?*

{¶ 32} WHDD urges us to steer away from *Cincinnati Golf Mgt.* and instead apply the branch of agency law concerned with the control test. This argument picks up on a theme described above, with WHDD emphasizing that Sunoco exercises control over its responsibilities for managing and protecting Sunoco's intangible assets when they are used by retailers. WHDD additionally asserts that Sunoco exercises control over it with respect to its involvement with Sunoco's credit- and debit-card programs, through which Sunoco makes certain card equipment available to WHDD, which then passes the equipment along to retailers. Under the agreement, WHDD is required to train its own personnel and retailers on how to use the card equipment in strict compliance with Sunoco's directives. If WHDD fails to follow the requirements of the card program, Sunoco is permitted to terminate the agreement. Taking things a step further, WHDD asserts that

12

Sunoco's control is reflected not only in the duties assigned in the Sunoco contract but also in the duties Sunoco later assigned via interim instructions.

{¶ 33} Dispositive here is that in *Cincinnati Golf Mgt.*, we declined an invitation to follow the control test: "Despite the extensive discussion of the control test by the BTA and the parties, we conclude that the proper focus is on whether or not CGMI [Cincinnati Golf Management, Inc.] had an agent's actual authority to bind Cincinnati as the purchaser in the transactions at issue." 132 Ohio St.3d 299, 2012-Ohio-2846, 971 N.E.2d 929, at ¶ 20. Accordingly, we reject WHDD's invocation of the control test under these circumstances.

{¶ 34} Even assuming that the control test applied, WHDD's agency argument would still falter. "[T]he legal consequences of agency may attach to only a portion of the relationship between two persons, a fact that dictates care in using the term 'agency relationship.' " 1 Restatement of the Law 3d, Agency, Section 1.01, at 18. As noted above, the focal point of this case is WHDD's gasoline dealings. Thus, WHDD would need to show that Sunoco exercised sufficient control over WHDD's sales of gasoline to retailers. But WHDD does not develop an argument on this point. Moreover, the Sunoco contract provides that WHDD is "free to select its customers and set its own selling prices and terms of sale" in dealing with retailers and that WHDD is "in total control of [its] business and the [gasoline] and other products covered" in the agreement. The separateness of WHDD and Sunoco was reaffirmed by Continenza, who testified that Sunoco does not refer retailers to WHDD.

## CONCLUSION

{¶ 35} For the foregoing reasons, we affirm the BTA's decision.

Decision affirmed.

O'CONNOR, C.J., and O'DONNELL, FRENCH, FISCHER, DEWINE, and DEGENARO, JJ., concur.

KENNEDY, J., concurs in judgment only.

_____

Timothy G. Teresczuk Co., L.P.A., and Timothy G. Teresczuk, for appellant.

Michael DeWine, Attorney General, and Barton A. Hubbard, Assistant Attorney General, for appellee.

_____