[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Complaint of Wingo v. Nationwide Energy Partners, L.L.C.*, Slip Opinion No. 2020-Ohio-5583.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2020-OHIO-5583

IN RE COMPLAINT OF WINGO, APPELLANT, *v*. NATIONWIDE ENERGY PARTNERS, L.L.C., INTERVENING APPELLEE; PUBLIC UTILITIES COMMISSION OF OHIO, APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Complaint of Wingo v. Nationwide Energy Partners, L.L.C.*, Slip Opinion No. 2020-Ohio-5583.]

*Public Utilities—R.C. 4905.03 and 4905.04—Public Utilities Commission's jurisdiction over customer's claims against submetering company— Commission's jurisdiction is defined by statute—Commission has jurisdiction over "public utilities"—Commission improperly adopted a jurisdictional test of its own making to determine whether submetering company was a "utility" rather than applying the relevant legal standards provided in the jurisdictional statute—Order reversed and cause remanded.*

(No. 2019-0273—Submitted May 12, 2020—Decided December 9, 2020.)

APPEAL from the Public Utilities Commission, No. 17-2002-EL-CSS.

_____

**DeWine, J.**

{¶ 1} This case involves a complaint filed with the Public Utilities Commission of Ohio ("PUCO") against a company that provides submetering services. Submetering involves buying gas, electric and other services from a public utility and then reselling those services to the ultimate consumer. The PUCO dismissed the complaint, concluding that it did not have jurisdiction over the claims against the submetering company.

{¶ 2} The PUCO's jurisdiction is provided by statute, and broadly speaking, it has jurisdiction over any business that is a "public utility." *See* R.C. 4905.04. But in the decision below, the PUCO did not look to the statutory scheme to determine whether the submeterer is a public utility; instead, it applied a jurisdictional test of its own devising. This was improper. The General Assembly writes the laws determining the PUCO's jurisdiction, not the PUCO. Thus, we reverse the PUCO's dismissal of the complaint and remand for the PUCO to determine its jurisdiction based upon the jurisdictional statute.

## I. Background

{¶ 3} The underlying question in this matter is whether the PUCO has jurisdiction over claims about submetering services provided by Nationwide Energy Partners, L.L.C. ("NEP"). Submetering is a practice in which an entity "engage[s] in the resale or redistribution of public utility services." *In re the Commission's Investigation of Submetering in the State of Ohio*, Pub. Util. Comm. No. 15-1594-AU-COI, Fourth rehearing entry, ¶ 4 (Jan. 9, 2019). Originally, submetering developed with an apartment owner, or other similar owner of a multi-residential complex, dividing up a common master bill so that each individual resident would pay for their share of the utilities used. Today, submetering is big business, with third-party resellers such as NEP providing submetering services for multiple properties and landlords. These resellers make their profit largely because

they are able to purchase utility services at a wholesale price that is less than the resale price they charge to individual customers.[1]

{¶ 4} Cynthia Wingo is one such customer. In September 2017, she filed a complaint with the PUCO alleging that as a condition of her apartment lease, she is required to purchase water, sewer, and electric services from NEP.[2] She asserted that although "NEP claims to bill residents and tenants at the residential rate charged by the host utility," it does not offer services equivalent to those received by direct customers of the utility. Because NEP is not subject to regulation by the PUCO, she alleged, it does not provide certain benefits and protections that a customer would receive if she contracted directly with a public utility. These include rebates and energy-efficiency measures offered by the host utility, certain emergency-assistance programs for lower-income residents, protections against disconnections, and various other consumer-protection measures.

{¶ 5} Shortly after filing an answer, NEP sought dismissal of Wingo's complaint. NEP maintained that it is not a public utility and, consequently, is not subject to the PUCO's jurisdiction. In order to evaluate this assertion, the PUCO

---

1. Background information on the history and practice of submetering can be found in a host of materials. *See, e.g.*, *Campo Corp. v. Feinberg*, 110 N.Y.S.2d 250, 252, 279 A.D. 302 (1952) (describing the practice by landlords in New York City at the turn of the twentieth century of purchasing electricity from a public utility at a wholesale rate and reselling the electricity to their tenants at a retail rate); *Manufactured Hous. Inst. v. United States Environmental Protection Agency*, 467 F.3d 391, 394 (4th Cir.2006) (defining submetering as the practice of "property owners metering and billing their tenants for water purchased by the owners but distributed to and actually used by the tenants"); Nationwide Energy Partners, *Who We Are*, https://www.nationwideenergypartners.com/about (accessed Sept. 23, 2020) [https://perma.cc/5FYY-WF82]; Gearino, *Shocking Cost Investigation: Utility Middle Men Charge Renters Inflated Prices*, Columbus Dispatch (Oct. 20, 2013), https://www.dispatch.com/news/20131020/shocking-cost-investigation-utility-middle-men-charge-renters-inflated-prices (accessed Sept. 23, 2020) [https://perma.cc/M5TA-2ZNW].

2. Wingo's complaint also included a claim that a natural gas company's provision of submetering services also constituted the unregulated provision of public-utility services. That company did not choose to intervene in this appeal. As a result, we limit our analysis to Wingo's claims made against NEP.

examined NEP's activities and the services NEP provided to Wingo and her landlord under a test originally set forth in a 1992 PUCO order (the "*Shroyer* test") and recently modified by the PUCO (the "modified *Shroyer* test"). *See* Pub. Util. Comm. No. 17-2002-EL-CSS, ¶ 64-68, 70-78 (Oct. 24, 2018). Using the modified *Shroyer* test, the PUCO concluded that NEP is not a public utility and dismissed Wingo's complaint for lack of jurisdiction. *Id*. at ¶ 91.

{¶ 6} Wingo twice applied for rehearing, but the PUCO denied her applications. Pub. Util. Comm. No. 17-2002-EL-CSS, Second rehearing entry, ¶ 1 (Feb. 6, 2019). She then filed an appeal in this court, raising six propositions of law—the fifth of which we previously dismissed for lack of jurisdiction. 157 Ohio St.3d 1518, 2019-Ohio-5289, 136 N.E.3d 1522.

## II. The PUCO's Jurisdiction Is Established by Statute, Not by an Agency-Created Test

{¶ 7} In Wingo's first proposition of law, she contends that the PUCO erred in concluding that it lacked subject-matter jurisdiction. In her second and fourth propositions of law, she argues that the PUCO erred in its application of the law to the facts alleged in her complaint and failed to adequately explain or support its decision. Central to a resolution of each of these propositions is a common issue: whether determination of the PUCO's jurisdiction is governed by statute or by a test of the PUCO's own creation. Wingo asserts that the PUCO's use of its own jurisdictional test, rather than the applicable statutory language, to determine whether NEP is a public utility was improper. We agree.

### A. The PUCO's Jurisdiction Is Defined by the General Assembly

{¶ 8} The General Assembly has vested the PUCO with the "power and jurisdiction to supervise and regulate public utilities." R.C. 4905.04; *see also* R.C. 4905.05; R.C. 4905.06. The PUCO "has no authority to act beyond its statutory powers." *Discount Cellular, Inc. v. Pub. Util. Comm.*, 112 Ohio St.3d 360, 2007-

Ohio-53, 859 N.E.2d 957, ¶ 51.  Thus, whether the PUCO has jurisdiction in this case depends on whether NEP is a public utility.

{¶ 9} The statutory scheme defines what is a public utility.  R.C. 4905.02 tells us that, with a handful of exceptions, a "public utility" is any entity that is defined in R.C. 4905.03.  That section, in turn, defines several types of public utilities, three of which are relevant to the services that NEP provides to Wingo:

> (C) An electric light company, when engaged in the business of supplying electricity for light, heat, or power purposes to consumers within this state, including supplying electric transmission service for electricity delivered to consumers in this state, but excluding a regional transmission organization approved by the federal energy regulatory commission;
>
> * * *
>
> (G) A water-works company, when engaged in the business of supplying water through pipes or tubing, or in a similar manner, to consumers within this state;
>
> * * *
>
> (M) A sewage disposal system company, when engaged in the business of sewage disposal services through pipes or tubing, and treatment works, or in a similar manner, within this state.

### B.  The PUCO Created Its Own Jurisdictional Test

{¶ 10} In the proceeding below, the PUCO did not apply the statutory language.  Instead, it looked to a test of its own making, the modified *Shroyer* test, to determine whether NEP is a public utility and therefore subject to PUCO jurisdiction.  Some historical background about the test's development is helpful here.

**{¶ 11}** The PUCO developed the original *Shroyer* test in a proceeding determining whether a trailer-park owner who purchased water from the city of Delaware and charged tenants for the water they used was operating as a public utility. *In re Complaints of Inscho v. Shroyer's Mobile Homes*, Pub. Util. Comm. Nos. 90-182-WS-CSS, 90-252-WS-CSS, and 90-350-WW-CSS, 1992 WL 937210 (Feb. 27, 1992). The test called for an evaluation of three questions: (1) whether the entity has "manifested an intent to be a public utility by availing [itself] of special benefits available to public utilities;" (2) whether the utility service is available to the general public rather than to a specific class of residents; and (3) whether the provision of utility services is "ancillary" to the entity's "primary business." *Id.*

**{¶ 12}** The modified *Shroyer* test that the PUCO used in this action has a more recent history. Beginning in December 2015, the PUCO undertook an investigation to develop a regulatory framework for the practice of submetering in Ohio. *In re the Commission's Investigation of Submetering in the State of Ohio*, Pub. Util. Comm. No. 15-1594-AU-COI, ¶ 1 (Dec. 16, 2015). In its conclusions to the investigation, the PUCO stated that it had adopted the *Shroyer* test as the means by which it determined whether an entity is a public utility. *In re the Commission's Investigation of Submetering in the State of Ohio*, Pub. Util. Comm. No. 15-1594-AU-COI, ¶ 16 (Dec. 7, 2016). And, as a result of its investigation, the PUCO announced it would apply the *Shroyer* test, with modifications, to entities engaged in submetering. *Id.* at ¶ 16-17.

**{¶ 13}** The PUCO adopted two modifications to the *Shroyer* test, which substantially changed the inquiry into whether an entity is a public utility. Most notably, the modified test creates a presumption under the third prong that a reseller *is* a public utility if it charges a customer more for utility services than the customer would pay "the local public utility under the default service tariff for the equivalent usage on a total bill basis." *In re the Commission's Investigation of Submetering*

6

*in the State of Ohio*, Pub. Util. Comm. No. 15-1594-AU-COI, Second rehearing entry, ¶ 49 (June 21, 2017). A reseller can rebut this presumption by showing that one of two safe harbors applies—either that (1) the reseller is "simply passing through its annual costs of providing a utility service charged by a local public utility" or (2) "the [r]eseller's annual charges for a utility service * * * do not exceed what the resident would have paid the local public utility for equivalent annual usage, on a total bill basis, under the local public utility's default service tariffs." *Id*. at ¶ 40.[3]

{¶ 14} Applying this modified test to Wingo's complaint, the PUCO determined that NEP is not a public utility. As to the first prong, it found that NEP has not manifested an intent to be a public utility because it has not taken advantage of the special benefits available to public utilities, such as eminent domain. Pub. Util. Comm. No. 17-2002-EL-CSS at ¶ 64, 68. As to the second prong, it concluded that NEP does not offer its services to the general public, but only to people living in a place where it has reached an arrangement with the owner. *Id*. at ¶ 65, 68. As

---

3. The "default service tariff" refers to the rate that customers would pay if they purchased utility services directly from their local regulated utility based on the utility's standard rates as filed with and approved by the PUCO. *See In re the Commission's Investigation of Submetering in the State of Ohio*, Pub. Util. Comm. No. 15-1594-AU-COI, Second rehearing entry, at ¶ 40, 49–50; *Hull v. Columbia Gas of Ohio*, 110 Ohio St.3d 96, 2006-Ohio-3666, 850 N.E.2d 1190, ¶ 25 (defining tariffs as the rates filed with and approved by the PUCO). Not all customers will pay this rate. Since the development of Ohio's "energy choice" program over the last decade, consumers have had the option to purchase electricity from a variety of suppliers, some of whom may offer a lower price than the local public utility. *See* PUCO, *Choosing an Electric Supplier*, https://puco.ohio.gov/wps/portal/gov/puco/utilities/electricity/resources/choosing-an-electric-supplier (accessed Sept. 28, 2020) [https://perma.cc/NQ8N-NKTP]; PUCO, *What Is Energy Choice Ohio?*, https://energychoice.ohio.gov/Pages/About%20Choice.aspx (accessed Oct. 5, 2020) [https://perma.cc/YC3Y-5KMQ]; PUCO, *How Are Electric Generation Rates Set?*, https://puco.ohio.gov/wps/portal/gov/puco/utilities/electricity/resources/how-are-electric-generation-rates-set (accessed Sept. 25, 2020) [https://perma.cc/L2NF-CJWY]. Consumers who purchase from suppliers other than their local public utility still have their electricity distributed to them by their local public utility and pay that local utility's distribution costs. Thomas, Lendel & Park, *Understanding Electricity Markets in Ohio*, Urban Publications, Maxine Goodman Levin College of Urban Affairs, Cleveland State University, 18-20 (July 2014), https://engagedscholarship.csuohio.edu/cgi/viewcontent.cgi?article=2270&context=urban_facpub (accessed Oct. 5, 2020) [https://perma.cc/VZ4K-CHQS].

to the third prong, it found that NEP is not a public utility because NEP simply passes through the cost of water and sewer services charged by the city of Reynoldsburg. *Id.* at ¶ 66. For the electric services, the PUCO accepted as true Wingo's allegation that she paid more for a single month than she would have if she were directly served by the local public utility, American Electric Power ("AEP"). It then utilized the second safe-harbor provision and concluded that, based on additional billing statements submitted by NEP, NEP's charges to Wingo were less on an annual basis than she would have paid under AEP's default service tariff. *Id.* at ¶ 74-78.

{¶ 15} The question is whether the PUCO's use of the modified *Shroyer* test to determine the extent of its jurisdiction is appropriate.

### C. The PUCO's Modified **Shroyer** *Test Bears Little Relation to the Statutory Scheme*

{¶ 16} In its original version—and used in the context for which it was developed (a trailer-park operator apportioning water costs among tenants)—the *Shroyer* test bore some connection to the statutory scheme. The inquiries into (1) whether the trailer-park operator had manifested an intent to be a public utility, (2) whether the trailer-park operator resold water to others outside of the trailer park, and (3) whether water resale was "ancillary" to the primary business of operating a trailer park can all be connected to the statutory language—that is, whether the trailer-park operator was a "water-works company, * * * engaged in the business of supplying water through pipes or tubing, or in a similar manner, to consumers within this state," R.C. 4905.03(G).

{¶ 17} In contrast, the PUCO's modifications to the *Shroyer* test are remarkable for their almost complete disconnect from the statutory language. The third prong of the original test—whether utility services are "ancillary" to the reseller's primary business—is grounded in the statutory language. Thus, if metering services are completely ancillary to a business—say a building owner who

8

simply passes on electricity costs as a convenience to its tenants—it would seem fair to say that the landlord is not "an electric light company" and is not "engaged in *the business of* supplying electricity." (Emphasis added.) R.C. 4905.03(C). But, as modified, the third prong of the *Shroyer* test goes well beyond considerations whether utility-resale activities are ancillary to another business. Instead, the modified test, with its presumption and safe harbors, focuses on how much profit the reseller makes and whether the consumer is charged more than she would have been under the default-service-tariff rates. This is an inquiry that has nothing to do with the statutory language.

{¶ 18} The PUCO argues this court's decision in *Pledger v. Pub. Util. Comm.*, 109 Ohio St.3d 463, 2006-Ohio-2989, 849 N.E.2d 14, affirmed its use of the *Shroyer* test to determine if an entity is a public utility, and the PUCO further assumes that this affirmation gives it the power to adopt the modified *Shroyer* test as the means by which it determines if an entity is a public utility. But this position is in error.

{¶ 19} No decision of this court can give the PUCO the authority to write its own jurisdictional rules. It is axiomatic that "where jurisdiction is dependent upon a statutory grant, this court is without the authority to create jurisdiction when the statutory language does not. That power resides in the General Assembly." *Waltco Truck Equip. Co. v. Tallmadge Bd. of Zoning Appeals*, 40 Ohio St.3d 41, 43, 531 N.E.2d 685 (1988).

{¶ 20} Moreover, we find nothing in *Pledger* that authorizes the PUCO to write its own jurisdictional rules. *Pledger* dealt with an apartment owner that charged tenants for the water used in their apartments. *Pledger* at ¶ 2. The water was purchased from the Akron Water Department, and the landlord simply billed tenants for the water they used at Akron's rate, plus a 10 percent administrative charge. *Id.* When tenants filed a complaint, the PUCO applied the original three-part *Shroyer* test and determined it did not have jurisdiction and dismissed the

complaint. *Id.* at ¶ 7. On appeal, the tenants challenged the PUCO's use of the third prong of the *Shroyer* test, arguing that the statutory text did not allow for consideration whether reselling utility services was "ancillary" to the landlord's primary business. *Id.* at ¶ 26. The tenants pointed to the phrase "in the business of" in the text of R.C. 4905.03 and argued that anyone who buys and sells utility services falls under PUCO's jurisdiction. *Id.* This court disagreed with the tenants' reading of the statute and affirmed the PUCO. We explained:

> Appellant's argument ignores the fact that the noun "business" is followed in both statutory provisions by the preposition "of," which is used to introduce words describing the noun preceding it. A utility is not in the "business of" buying and selling an ordinary commodity or service. Instead, R.C. 4905.03(A)(8) [now R.C. 4905.03(G)] refers to the "business of *supplying* water through pipes or tubing, or in a similar manner," and R.C. 4905.03(A)(14) [now R.C. 4905.03(M)] refers to the "business of [*providing*] sewage disposal services through pipes or tubing, and treatment works, or in a similar manner."

(Emphasis and third brackets added in *Pledger*.) *Id.* at ¶ 27.

{¶ 21} Contrary to the PUCO's suggestion, *Pledger* was decided based upon a textual application of the jurisdictional statute. This court rejected the challenge to the third prong of the *Shroyer* test precisely because it found the PUCO's interpretation consistent with the jurisdictional statute and the tenants' interpretation inconsistent with the statutory text. Thus, *Pledger* stands for the proposition that any jurisdictional test used by the PUCO must be moored in the statutory language. Nothing in *Pledger* gives the PUCO the power to write jurisdictional rules that go beyond the statutes drafted by the General Assembly.

{¶ 22} In applying its modified *Shroyer* test, the PUCO is making a policy judgment about who it wants to regulate. "*Resellers*," it is saying, "*as long as you don't charge too much (as measured by default-service-tariff rates), we will leave you alone. We won't even consider complaints filed against you. But cross that price line, and you are subject to our jurisdiction and our rules*."

{¶ 23} The PUCO even acknowledges that its jurisdictional test is nothing more than a policy judgment. It says the second safe harbor "is justified because the resident can not [sic] be considered harmed by the submetered arrangement if the resident is paying the same amount as if the resident was served directly by the public utility." Pub. Util. Comm. No. 17-2002-EL-CSS at ¶ 73. But whether someone is "harmed" isn't a jurisdictional question; it is a merits question that can be answered only after it is determined that an activity falls within the PUCO's jurisdiction.

{¶ 24} This is not to say that the policy judgment that the PUCO is making under the guise of defining its jurisdiction is unreasonable. After all, the PUCO, like all government entities, has finite resources. And, as far as consumer protection goes, it may be prudent to leave alone resellers who keep their charges within certain limits and go after others who gouge their customers. But defining the parameters of the PUCO's jurisdiction is up to the General Assembly, not the PUCO. And the jurisdictional price-line drawn by the PUCO has no connection to the statutory language that defines its jurisdiction.

{¶ 25} It may well make sense for the General Assembly to directly address the question whether entities who engage in submetering fall within the PUCO's jurisdiction. The jurisdictional statute doesn't directly address reselling, and at the time of its enactment, large-scale third-party-metering companies did not exist.[4] But until it does so, the PUCO must apply the law that is on the books. The fact

---

4. The jurisdictional statute dates from at least the 1950s. *See* 1953 Am.H.B No. 1, 125 Ohio Laws 7.

that interpreting the statute may involve some complexity doesn't give the PUCO license to write its own rules.

{¶ 26} Thus, we remand this case for the PUCO to determine whether it has jurisdiction based upon the jurisdictional statute, not the modified *Shroyer* test. In doing so, the PUCO will need to apply R.C. 4905.03 and determine whether NEP is an "electric light company," "water-works company," or "sewage disposal system company" "in the business of supplying" any of the covered services. Of particular significance in this inquiry are the meanings of the terms "an electric light company," "water-works company," and "sewage disposal system company" and "in the business of" and "supplying," and the application of those terms to the facts of the case. The application of the relevant legal standards to the facts is one that is best left to the PUCO in the first instance.

### III. We Cannot or Need Not Consider Wingo's Other Propositions of Law

{¶ 27} The remaining propositions of law can be addressed in short order. In her third proposition, Wingo claims that the PUCO erred by considering matters outside of the pleadings in granting NEP's motion to dismiss under Civ.R. 12(B)(6). NEP counters that consideration of matters outside of the pleadings is appropriate under Civ.R. 12(B)(1) on a motion to dismiss for a lack of subject-matter jurisdiction. In light of our remand to the PUCO to apply the proper jurisdictional test, this matter does not present a live controversy. We trust that on remand, the PUCO will apply the proper standards and make clear to the parties the evidentiary framework under which it is operating.

{¶ 28} In her sixth proposition of law, Wingo challenges the PUCO's decision to grant rehearing solely for the purpose of extending its time to consider her rehearing application and attempts to use this case to make a generalized challenge to what she says is routine practice of the PUCO. She points to R.C. 4903.10(B), which provides that "if the commission does not grant or deny such application for rehearing within thirty days from the date of filing thereof, it is

12

denied by operation of law." Wingo and amicus curiae, Industrial Energy Users-Ohio, which also advances the issue, may well have a legitimate complaint, but this appeal is not the appropriate vehicle for considering this question. The injury that Wingo complains of—the PUCO's granting itself an extension—is not one that can be redressed by a decision in her favor. *See ProgressOhio.org, Inc. v. JobsOhio*, 139 Ohio St.3d 520, 2014-Ohio-2382, 13 N.E.3d 1101, ¶ 7. Here, even if the PUCO erred by granting the extension, it did not change the outcome of the proceeding below. The PUCO's decision to dismiss her complaint remained unchanged. Thus, a ruling on the issue here could have no effect on the outcome of the case and is not properly before us.

## IV. Conclusion

{¶ 29} For the reasons stated above, we reverse the PUCO's decision dismissing Wingo's complaint and remand the cause for further hearing. Further, we direct the PUCO to apply the jurisdictional statute and not the modified *Shroyer* test, in assessing its jurisdiction.

Order reversed

and cause remanded.

O'CONNOR, C.J., and KENNEDY, FRENCH, and STEWART, JJ., concur.

DONNELLY, J., concurs in judgment only.

FISCHER, J., dissents.

_____

Whitt Sturtevant, L.L.P., Mark A. Whitt, and Lucas A. Fykes, for appellant.

Dave Yost, Attorney General, and John Jones and Robert A. Eubanks, Assistant Attorneys General, for appellee.

Vorys, Sater, Seymour & Pease, L.L.P., Michael J. Settineri, and Daniel E. Shuey, for intervening appellee.

McNees, Wallace & Nurick, L.L.C., Frank P. Darr, and Matthew R. Pritchard, urging reversal for amicus curiae Industrial Energy Users-Ohio.

_____