[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Complaint of Ohio Power Co. v. Nationwide Energy Partners, L.L.C.*, Slip Opinion No. 2026-Ohio-1406.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2026-OHIO-1406

IN RE COMPLAINT OF OHIO POWER COMPANY, APPELLANT, *v.* NATIONWIDE ENERGY PARTNERS, L.L.C., INTERVENING APPELLEE; PUBLIC UTILITIES COMMISSION, APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Complaint of Ohio Power Co. v. Nationwide Energy Partners, L.L.C.*, Slip Opinion No. 2026-Ohio-1406.]

*Public utilities—R.C. 4905.02(A)—R.C. 4905.03(C)—Company providing electric submetering services to apartment complexes meets statutory definition of "electric light company" and is therefore a "public utility" under R.C. 4905.02(A) that is subject to jurisdiction of Public Utilities Commission under R.C. 4905.03(A)—Orders reversed and cause remanded.*

(No. 2024-0207—Submitted June 3, 2025—Decided April 22, 2026.)

APPEAL from the Public Utilities Commission, No. 21-990-EL-CSS.

_____

DEWINE, J., authored the opinion of the court, which KENNEDY, C.J., and FISCHER, BOYLE, HAWKINS, and SHANAHAN, JJ., joined. BRUNNER, J., concurred in judgment only. MARY J. BOYLE, J., of the Eighth District Court of Appeals, sitting for DETERS, J.

**DEWINE, J.**

{¶ 1} Nationwide Energy Partners, L.L.C. ("NEP") provides electric submetering services. We have described submetering as "buying gas, electric, and other services from a public utility and then reselling those services to the ultimate consumer." *In re Complaint of Wingo v. Nationwide Energy Partners, L.L.C.*, 2020-Ohio-5583, ¶ 1. The question in this case is whether NEP falls within the statutory definition of a "public utility" and is thus subject to the jurisdiction of the Public Utilities Commission of Ohio ("PUCO").

{¶ 2} We hold that NEP is subject to PUCO's jurisdiction. PUCO's jurisdictional statute defines a public utility to include an entity "engaged in the business of supplying electricity . . . to consumers within this state," R.C. 4905.03(C). The record in this case shows that NEP does exactly that.

{¶ 3} The undisputed facts demonstrate that based on contractual arrangements with landlords, NEP purchases electricity and then resells that electricity to thousands of tenants. It installs at its own expense the necessary distribution and metering equipment. It chooses a supplier for the electricity it purchases and sets the price at which it resells the electricity to tenants. It directly bills tenants for their use of electricity and may disconnect service if a tenant fails to pay. It earns a profit based on the difference between the price it pays for electricity and the price it resells electricity. In short, NEP is in the business of supplying electricity to consumers.

{¶ 4} In the proceedings below, PUCO held otherwise, and thus concluded that it lacked jurisdiction to regulate NEP's business practices. We reverse PUCO's

determination that it lacked jurisdiction over NEP and remand this case to PUCO for further proceedings.

## I. BACKGROUND

{¶ 5} This case arose after NEP entered into contracts with the landlords of five apartment complexes for the exclusive right to supply electrical services to their tenants. The tenants had previously purchased electricity from Ohio Power Company ("AEP Ohio"), and NEP asked AEP Ohio to alter the meters at those apartment complexes to enable NEP to supply electricity to those properties.

{¶ 6} AEP Ohio ultimately denied the conversion requests and filed with PUCO a complaint against NEP, alleging that NEP was unlawfully operating as a public utility.

## A. PUCO Proceedings

{¶ 7} AEP Ohio raised three counts in its complaint. In Count I, it alleged that NEP was operating as a public utility. In Count II, it alleged that NEP was improperly supplying electricity in AEP Ohio's service area, in violation of R.C. 4933.83(A). And in Count III, it alleged that NEP was supplying or arranging competitive retail-electric services without the required certification, in violation of R.C. 4928.08(B). In response to the complaint, NEP brought two counterclaims. The first alleged that AEP Ohio engaged in discriminatory conduct, in violation of R.C. 4905.26, by denying NEP's conversion requests for the apartment complexes. The second alleged that AEP Ohio violated R.C. 4905.35(A) by subjecting NEP and its customers to undue prejudice and disadvantage.

{¶ 8} PUCO held a hearing and ultimately issued an opinion and order. On the threshold issue whether NEP was operating as a public utility, PUCO concluded that it was not. 2023 WL 5880187, *60 (Sept. 6, 2023). PUCO's jurisdiction extends to "an electric light company, when engaged in the business of supplying electricity . . . to consumers within this state," R.C. 4905.03(C); *see also* R.C. 4905.02(A)(1). PUCO concluded that NEP did not fall within this statutory

definition for two reasons—the tenants were not "consumers" of electricity, 2023 WL 5880187 at *61, and NEP was not "engaged in the business of supplying electricity," *id.* at *65. Relying on this jurisdictional determination, PUCO rejected AEP Ohio's claims that NEP was illegally operating in AEP Ohio's certified territory and that NEP was supplying competitive electrical services without the required certification. *Id.* at *78.

{¶ 9} Despite holding that NEP was not a public utility and that it could not regulate NEP's actions, PUCO stated that it was concerned about harm to NEP customers who did not enjoy the same protections as customers of a regulated utility. *See id.* at *76. Therefore, it ordered AEP Ohio to file a new electric-reseller tariff that would impose conditions on NEP's resale of electricity to its tenants. *Id.* Specifically, NEP would be required to (1) notify customers that they were losing the legal rights associated with PUCO's jurisdiction, (2) not resell electricity at a higher rate than a regulated utility, and (3) follow PUCO's standards for disconnection of electric service for nonpayment. *Id.*

{¶ 10} PUCO rejected the allegations of misconduct in NEP's counterclaims, with one exception. It concluded that AEP Ohio had acted unreasonably by adopting a blanket policy of denying conversion requests from landlords seeking to utilize the services of a third-party submetering company. *Id.* at *90, 108.

{¶ 11} After its petition for a rehearing was denied, *see* 2023 WL 8716278, *1, 15 (Dec. 13, 2023), AEP Ohio filed this appeal. In its appeal, AEP Ohio challenges (1) PUCO's determination that NEP is not a public utility, (2) PUCO's directive that AEP Ohio file a new electric-reseller tariff imposing conditions on NEP's resale of electricity, and (3) PUCO's conclusion that AEP Ohio violated R.C. 4905.26 by adopting a blanket policy of denying landlords' requests to convert properties to master-meter service unless the landlords agreed not to utilize a

submetering company. We granted NEP's motion to intervene as an appellee. 2024-Ohio-912.

### B. NEP's Business Model

{¶ 12} We have explained that "[o]riginally, submetering developed with an apartment owner, or other similar owner of a multiresidential complex, dividing up a common master bill so that each individual resident would pay for his or her share of the utilities used." *Wingo*, 2020-Ohio-5583, at ¶ 3. However, "[t]oday, submetering is big business, with third-party resellers such as NEP providing submetering services for multiple properties and landlords." *Id.* A lengthy factual record was developed in the PUCO proceedings detailing how NEP's business works.

{¶ 13} NEP negotiates contracts with landlords of large apartment complexes to handle the direct provision of electricity to their tenants. Under these contracts, NEP purchases electric-generation services and then supplies this electricity to individual tenants. NEP in its "sole discretion" may select the source of the electricity that it provides to tenants. It can purchase electricity from the local default utility provider (e.g., AEP Ohio) or it can purchase electricity from an alternative source, such as an electricity aggregator or a competitive retail-electric-service supplier. As a term of their contracts with NEP, the landlords explicitly waive any right to make decisions regarding the purchase of electricity. Regardless of the source of supply, NEP is obligated to pay the provider the cost of the electricity purchased, and NEP is contractually obligated to hold harmless the landlords for any loss or damage if NEP fails to pay.

{¶ 14} The electricity is supplied to tenants through equipment that is purchased, installed, and maintained by NEP. NEP provides and maintains the necessary equipment to distribute electricity from the "master meter" of the apartment complexes to individual tenants. This equipment includes weatherheads through which overhead power lines enter the buildings, wires, electrical conduits

through which the wires run, and current-transformer cabinets. It also provides and maintains individual meters to measure the electricity use of each tenant. It is responsible for all necessary repairs and replacement of the meter equipment and must do so based on the standards applicable to public utilities. NEP's bills instruct tenants to contact NEP with any questions.

{¶ 15} NEP sets the price that it charges tenants for electricity. Under the contracts with the landlords of record in this action, NEP has agreed not to charge tenants more for their individual usage than AEP Ohio's residential default rate. NEP sends individual bills to tenants, and the tenants pay NEP directly. NEP may also collect security deposits from tenants. NEP's bill is formatted to look like a bill from a traditional electricity supplier. Tenants are billed for their individual electricity use and for a proportional share of the electricity used in the common areas of their apartment complexes. NEP makes a profit because it pays for electricity at AEP Ohio's commercial rate and then resells it at a rate that is based on AEP Ohio's higher residential rate.

{¶ 16} NEP may disconnect tenants who fail to pay their bills. And according to PUCO, it did so "frequently" in 2021. 2023 WL 5880187 at *68. NEP maintains its own call center to field customer complaints and deal with service issues. It also offers payment plans for those who fall behind with their bills.

{¶ 17} From the tenants' perspective, NEP is for all practical purposes the supplier of their electricity. But NEP has incorporated into its contracts with the landlords certain terms that are intended to support the notion that it is the landlords who supply the electricity. The contracts state that NEP will act on the landlords' "behalf" in purchasing and supplying electricity to tenants and that NEP is the landlords' "agent and authorized representative." The electricity costs, for which NEP directly bills tenants, are described as part of the tenants' rent. The contracts also provide that the landlords will "take title" to the electricity delivered to the master meter, although they do not ascribe any legal significance to that

characterization. As originally executed, the contracts provided that NEP was the "owner and title holder of the [m]eter [e]quipment." But after AEP Ohio filed its complaint with PUCO, NEP amended its agreements with the landlords to provide that the landlords are "deemed to be" the owners and title holders of the meter equipment.

{¶ 18} Finally, although NEP purports to be the landlords' agent, the only compensation that NEP receives is the profits that it makes by reselling electricity to the tenants. NEP pays the landlords for this exclusive right to sell electricity to the landlords' tenants. The landlords in this case were paid an initial "door fee" ranging from $22,400 to $72,000, and they received an additional $6 monthly payment for each tenant.

## C. Our Prior Decision in *Wingo*

{¶ 19} This is not the first time the question whether a submetering company falls under PUCO's jurisdiction has come before this court. In *Wingo*, we reversed a PUCO order that concluded that NEP was not a public utility because PUCO had based that determination on a jurisdictional test of its own making rather than the text of R.C. 4905.03. *See Wingo*, 2020-Ohio-5583, at ¶ 26. On remand, the tenant voluntarily dismissed her complaint against NEP before PUCO could decide the jurisdictional issue. *See In re Complaint of Wingo*, PUCO No. 17-2002-EL-CSS, 2021 WL 3036829, *1, 4 (July 14, 2021). In *Wingo*, we suggested that "it may well make sense for the General Assembly to directly address the question whether entities that engage in submetering fall within the PUCO's jurisdiction." *Wingo* at ¶ 25. We explained that "[t]he jurisdictional statute doesn't directly address reselling, and at the time of its enactment, large-scale third-party-metering companies did not exist." *Id*. The General Assembly has not done so, so it falls to this court to determine whether NEP is subject to PUCO's jurisdiction. But of

course, whatever this court decides, the General Assembly retains the ability to legislatively determine PUCO's jurisdiction over submetering companies.

## II. ANALYSIS

{¶ 20} The General Assembly has vested PUCO with "the power and jurisdiction to supervise and regulate public utilities." R.C. 4905.04; *see also* R.C. 4905.05 and 4905.06. This jurisdiction over public utilities includes an "electric light company," R.C. 4905.02(A). An "electric light company" is defined as an entity "engaged in the business of supplying electricity for light, heat, or power purposes to consumers within this state, including supplying electric transmission service for electricity delivered to consumers in this state." R.C. 4905.03(C). In the proceedings below, PUCO determined that NEP does not fall under this statutory definition for two reasons. First, it determined that residents who purchase electricity from NEP are not "'consumers'"; instead, only the landlords are consumers. 2023 WL 5880187 at *61; *see also* 2023 WL 8716278 at *12-13. Second, it determined that although the landlords supply electricity to their tenants, NEP does not supply electricity. 2023 WL 5880187 at *68. In its view, NEP simply acted as the landlords' agent. *Id.*

{¶ 21} As the relevant facts are largely undisputed, PUCO's determination that NEP is engaged in the business of supplying electricity to consumers was purely a legal conclusion. Thus, our standard of review is de novo. *See TWISM Ents., L.L.C. v. State Bd. of Registration for Professional Engineers & Surveyors*, 2022-Ohio-4677, ¶ 38.

{¶ 22} And applying de novo review, we find PUCO's legal conclusions in conflict with the plain language of the relevant statutes. Tenants who purchase electricity are consumers of electricity and NEP is in the business of supplying electricity; therefore, NEP is a public utility. We now consider each of these issues in turn.

8

## A. The tenants are consumers of electricity

{¶ 23} The first basis for PUCO's decision that it does not have jurisdiction over NEP is that the tenants are not consumers. Recall that under the jurisdictional statute, an electric light company is defined to include an entity that is in the business of supplying electricity to "consumers within this state," R.C. 4905.03(C). Purporting to rely on caselaw from this court, as well as its own precedents, PUCO concluded that "NEP cannot be an electric light company because the landlord of each of the Apartment Complexes and not the tenant is the 'consumer,' as contemplated under R.C. 4905.03," 2023 WL 5880187 at *61.

{¶ 24} As a matter of plain English, this reading of the statute is self-evidently wrong. *Webster's* defines a "consumer" as "one that consumes" or "one that utilizes economic goods." *Webster's Third New International Dictionary* (2002). And *Webster's* defines "consumes" as "to utilize (an economic good) in the satisfaction of wants or the process of production." *Id.* Similarly, the Oxford English Dictionary defines "consumer" as a "person who uses up a commodity; a purchaser of goods or services, a customer." *Oxford English Dictionary* (2000). Because the tenants consume or utilize electricity in their apartments, they fall within the plain meaning of "consumers."

{¶ 25} In reaching a contrary decision, PUCO relied heavily on *Pledger v. Pub. Util. Comm.*, 2006-Ohio-2989, claiming that that decision provides "definitive clarification regarding the issue of whether the landlord or the tenant is the 'consumer.'" 2023 WL 5880187 at *63. In *Pledger*, two submetered tenants filed a complaint with PUCO against their landlord, asserting that the landlord was acting as a public utility when submetering water services. *See Pledger* at ¶ 1-4. PUCO dismissed the complaint, applying a three-part test that it had developed in *In re Complaints of Inscho v. Shroyer's Mobile Homes*, PUCO Nos. 90-182-WS-CSS, 90-252-WS-CSS, and 90-350-WS-CSS, 1992 WL 937210 (Feb. 27, 1992). *See Pledger* at ¶ 5-7. We affirmed PUCO's decision, concluding that it had properly

applied the *Shroyer* test to find that PUCO lacked jurisdiction over the landlord. *Pledger* at ¶ 25. We also noted that PUCO appropriately concluded that the landlord's primary business was being a landlord and that the supply of water services was ancillary to its primary business. *Id.* at ¶ 30.

{¶ 26} Although it was not necessary for us to do so, we went on to comment that "it is important that the 'consumers' be identified in this appeal," *id.* at ¶ 32. We then rejected the notion that "it is the tenant rather than the landlord who is the consumer of the commodity provided by a water-works utility." *Id.* at ¶ 35. Instead, we held that the "[l]andlords are consumers of utility service, even though they resell that service to their tenants," *id*. at ¶ 37, because a "landlord consumes utility services in the process of engaging in its business of renting apartment space," *id*. at ¶ 39.

{¶ 27} *Pledger* is not dispositive of the meaning of "consumer" in R.C. 4905.03(C) for several reasons. First, this court's treatment of the consumer issue was at least arguably dicta, appended to the opinion only after the court concluded that PUCO had properly dismissed the case for lack of jurisdiction based on the *Shroyer* test. *See In re Application of Moraine Wind, L.L.C.*, 2024-Ohio-3224, ¶ 14 (dicta that "was unnecessary to resolve the case . . . has no precedential force" [cleaned up]).

{¶ 28} Second, in *Pledger*, the court deferred to the commission's statutory interpretations. *See Pledger*, 2006-Ohio-2989, at ¶ 40. But we have since clarified that "the judicial branch is *never* required to defer to an agency's interpretation of the law." (Emphasis in original.) *TWISM*, 2022-Ohio-4677, at ¶ 3; *see also id.* at ¶ 47.

{¶ 29} Third, the court in *Pledger* apparently viewed itself as only loosely bound to the actual text of R.C. 4905.03, opining that the statutory definitions were "not self-applying" and that "[s]omething more than the words of the statute [was] needed" to determine whether the landlord met the definition of a "water-works

company." *Pledger* at ¶ 17. Our more recent caselaw has rejected this approach, making clear that jurisdiction must be determined based on the language of R.C. 4905.03 and that neither this court nor PUCO has the authority to create extratextual jurisdictional standards. *See Wingo*, 2020-Ohio-5583, at ¶ 21, 26.

{¶ 30} Fourth, the *Pledger* court labored under the misapprehension that there could be only one consumer—the landlord or the tenants, not both. *See Pledger* at ¶ 35. But there is no reason that both landlords and tenants cannot be consumers. For example, if AEP Ohio sold electricity to a battery-storage company that repackaged and resold that electricity directly to homeowners, it would not be hard to see how both the battery-storage company and homeowners to which it resold that electricity are consumers.

{¶ 31} Applying the dictionary definition of "consumer," it is at least arguably the case that a landlord "utilizes economic goods," *Webster's*, when it purchases utility services for resale to its tenants. And it is certainly the case that each tenant "utilizes economic goods" when they use water to clean their dishes or electricity to light a room. *Pledger* was simply wrong to assume that its conclusion that the landlord in that case was a consumer meant that the tenants were not consumers.

{¶ 32} Rather than rely on *Pledger's* atextual commentary, we apply the plain meaning of the word "consumer." Under that definition, the tenants in this case—who consume or utilize electricity, *see Webster's*—inarguably are consumers.

### B. NEP is "engaged in the business of supplying electricity"

{¶ 33} Having determined that tenants are consumers under R.C. 4905.03(C), the next question is whether NEP is "engaged in the business of supplying electricity" to them. Here again, if we simply apply a plain-language reading of the statute, there is little question that NEP meets the statutory definition of "[a]n electric light company." Relevant here, *Webster's* defines to "supply" as

"to satisfy a need or desire for: provide or furnish with: bring up or make available a quantity of." *Webster's Third New International Dictionary* (2002). Plainly, NEP "provide[s] or furnish[es]" tenants with electricity. It purchases electricity and then resells that electricity to tenants. And it provides the means (wires, electrical conduits, etc.) by which the electricity is delivered from the master meter to the tenants.

{¶ 34} Not only does NEP supply electricity, but it is in the business of doing so. This case involves five different apartment complexes at which NEP supplies electricity. And it is undisputed that NEP services consumers in numerous other apartment and condominium complexes.

{¶ 35} In concluding that NEP is not engaged in the business of supplying electricity, PUCO reasoned that our caselaw had developed a landlord-tenant exception to R.C. 4905.03(C), under which a landlord who resells utility services is not subject to PUCO's jurisdiction. *See* 2023 WL 5880187 at *69. It concluded that in this case, it is the landlords who supply electricity to the tenants. *Id.* And it concluded that because NEP serves as the landlords' agent and the landlords are not subject to PUCO's jurisdiction, NEP is also not subject to its jurisdiction. *Id.*

{¶ 36} PUCO's determination thus rests on two premises about the law: first, that landlords have a special exemption from PUCO's jurisdiction that the landlords can extend to third-party resellers and second, that NEP is nothing more than the landlords' agent. Both premises are incorrect.

*1. Any landlord-tenant exception to PUCO's jurisdiction does not necessarily extend to third-party resellers like NEP*

{¶ 37} Central to PUCO's analysis was its conclusion that the so-called landlord-tenant exception to PUCO's jurisdiction extends to NEP because NEP is operating as the landlords' agent. It emphasized that "AEP Ohio does not dispute that landlords can resell electricity service to tenants" without being considered a

12

public utility. *Id.* The flaw in that analysis is that it does not necessarily follow that because landlords may fall outside PUCO's jurisdiction, that NEP does as well.

{¶ 38} There is nothing in R.C. 4905.03(C) that explicitly exempts landlords from PUCO's jurisdiction. The idea that a landlord who resells electricity to a tenant is not subject to PUCO's jurisdiction traces back to our decision in *Jonas v. Swetland Co.*, 119 Ohio St. 12 (1928). There we concluded that a landlord who resold electricity to his own tenants in a building that he owned was not subject to regulation by PUCO. *Id.* at 16. Although we provided sparse reasoning for our decision in *Jonas*, the decision is best understood as resting on the notion that the landlord was not in the "*business of* supplying electricity" (emphasis added), R.C. 4905.03(C). Rather, the landlord was in the business of being a landlord and the resale of electricity to his tenants was simply incidental to that business.

{¶ 39} Later, in *Pledger*, we made that understanding more explicit. There we endorsed PUCO's conclusion that the landlord was not engaged in the business of supplying water, explaining, "PUCO found that [the landlord's] primary business was that of being a landlord and to the extent that it provides water and sewer service to its tenants, the provision of those services 'is ancillary to [the landlord's] primary business of being a landlord.'" *Pledger*, 2006-Ohio-2989, at ¶ 30, quoting *In re Complaint of Pledger v. Capital Properties Mgt., Ltd.*, 2004 WL 2578713, *2 (Oct. 6, 2004). Thus, as we put it in *Wingo*, "if metering services are completely ancillary to a business—say a building owner who simply passes on electricity costs as a convenience to its tenants—it would seem fair to say that the landlord is not 'an electric light company' and is not 'engaged in *the business of* supplying electricity'" (emphasis in original), *Wingo*, 2020-Ohio-5583, at ¶ 17, quoting R.C. 4905.03(C).

{¶ 40} But the fact that a landlord is not "in the business of supplying electricity" does not mean that NEP is not in that business. The record in this case demonstrates that NEP performs its electric-supply services for tenants at multiple

residential properties.  According to AEP Ohio's records, at the time of the PUCO hearing, NEP purchased some $8.5 million annually in electricity from AEP Ohio and serviced about 1.75 per cent of AEP Ohio's residential-customer base. Reselling electricity is by no means "ancillary" to NEP's business.  Regardless of whether the landlords are in the "business of supplying electricity," there can be no question that NEP is in that business.

*2.  NEP is not in a traditional agency relationship with the landlords*

**{¶ 41}** It is also not particularly significant that the contracts with the landlords describe NEP as the landlords' "agent."  As an initial matter, PUCO's legal conclusion that NEP is the landlords' agent is suspect.  The fact that a contract characterizes something as an agency relationship is not controlling; rather, it is the substance of the relationship that establishes whether agency exists.  1 Restatement of the Law 3d, Agency, § 1.02, at 50 (2006) ("Whether a relationship is characterized as agency in an agreement between parties . . . is not controlling."). The hallmark of an agency relationship is that the principal "exercises the right of control over the actions of another, and those actions are directed toward the attainment of an objective which the former seeks." *Hanson v. Kynast*, 24 Ohio St.3d 171 (1986), paragraph one of the syllabus.  But here, in most important respects, the landlords do not have the right to control NEP's actions.  NEP has the sole discretion, for example, to choose the supplier from which it purchases electricity.  It also has discretion over the price it charges when reselling electricity to tenants, subject only to the limitation that it not charge more than AEP Ohio's residential default rate.  Nor is NEP compensated for its services by the landlords in the way one would expect an agent to be.  *See Hanson* at 175 (one factor to be considered in determining whether an agency relationship exists is "whether the [purported agent] was receiving any compensation from the principal").  To the contrary, it is NEP who pays the landlords for the right to sell electricity to the tenants.  Further, the submetering equipment is supplied by NEP, not the landlords.

*See id.* (another factor to be considered in determining whether an agency relationship exists is "whether the principal supplied the tools and the place of work in the normal course of the relationship").

{¶ 42} On fair reading, NEP's relationship to the landlords does not look like a traditional agency relationship at all. A better characterization is that NEP is in a contractual relationship with the landlords in which it purchased from the landlords a monopoly right to resell electricity to their tenants. *See id.* at 174 (the difference between a buyer and an agent is that "a buyer retains goods primarily for his own benefit, while an agent is one who retains goods primarily for the benefit of the one who delivers those goods"), citing Restatement of the Law 2d, Agency, § 14J, at 73 (1958).

{¶ 43} PUCO also seemed to think it significant that the contracts provide that the landlords "take title" to the electricity at the master meters. *See* 2023 WL 5880187 at *67. But nothing in the contracts attaches any legal significance to this characterization. To "take title" ordinarily means that one obtains "'the legal right to control and dispose of property.'" *Willoughby Hills Dev. & Distrib., Inc. v. Testa*, 2018-Ohio-4488, ¶ 18, quoting *Black's Law Dictionary* (10th Ed. 2014). Here, the landlords acquired no such rights. NEP is obligated to deliver electricity to the tenants, and the tenants are obligated to pay NEP for the electricity. The landlords have no right or ability to resell the electricity or divert it for another use.

{¶ 44} Thus, none of the justifications relied on by PUCO support the result that it reached. The fact that the landlords may not be subject to PUCO's jurisdiction because they are not "in the business" of supplying electricity does not mean that NEP is not subject to PUCO's jurisdiction. And the mere recitation of words like "agent" and "take title" does nothing to alter the relationships in this case. Rather than rely on the labels that NEP has chosen, we should look at the economic realities of NEP's business model. The undisputed facts show that NEP has contracted for the ability to purchase and resell electricity to thousands of

tenants. While NEP has obtained authorization from landlords to do so, the landlords do not have the right to control most of NEP's activities. NEP engages in its business on its own behalf and with its own profit motive.

{¶ 45} The statutory question is whether NEP is engaged in the business of supplying electricity to tenants. PUCO concluded that the landlords supply electricity to the tenants. But if the landlords supply electricity, then certainly NEP—which actually purchases, sells, and delivers electricity—supplies electricity. And it "is in the business" of doing so. Under the statutory definition, all this makes NEP a public utility and, therefore, subject to the jurisdiction of PUCO.

## C. We remand this matter to PUCO

{¶ 46} AEP Ohio raised three counts in its complaint. On the first count, PUCO determined that NEP was not a public utility, and on this basis denied AEP Ohio's remaining claims. Because we reverse PUCO's determination that NEP is not a public utility, we remand this matter to PUCO for it to consider the merits of AEP Ohio's other two claims.

{¶ 47} AEP Ohio also challenges on appeal PUCO's order that it file a new electric-reseller tariff imposing conditions on NEP's resale of electricity to its tenants. AEP Ohio points out that it is inconsistent for PUCO to determine that it lacks jurisdiction over NEP and at the same time seek to regulate NEP through the reseller tariff. Based on our conclusion that PUCO has jurisdiction over NEP, we vacate PUCO's order on this issue and remand the matter to PUCO to consider the issue anew.

{¶ 48} Finally, AEP Ohio challenges PUCO's finding on NEP's counterclaim that it acted unreasonably by denying NEP's meter-conversion requests for apartment buildings. *See* 2023 WL 5880187 at *90. Because PUCO's

reasoning was partly based on its conclusion that NEP was not a public utility, we vacate this finding and remand the matter to PUCO for further consideration.

### III. CONCLUSION

{¶ 49} Because NEP is "engaged in the business of supplying electricity to consumers," it is subject to PUCO's jurisdiction under R.C. 4905.03(C). Therefore, we reverse PUCO's decision and remand this case to PUCO for further proceedings as explained above.

Orders reversed
and cause remanded.

_____

American Electric Power Service Corp., Steven T. Nourse, and Michael J. Schuler; and Porter, Wright, Morris & Arthur, L.L.P., L. Bradfield Hughes, and Eric B. Gallon, for appellant.

Dave Yost, Attorney General, John H. Jones, Amy Botschner O'Brien, Ambrosia E. Wilson, and Connor D. Semple, Assistant Attorneys General, for appellee.

Vorys, Sater, Seymour and Pease, L.L.P., Michael J. Settineri, Andrew P. Guran, and Anna Sanyal; and Nationwide Energy Partners, L.L.C., and Drew B. Romig, for intervening appellee.

Duke Energy Business Services, L.L.C., Rocco O. D'Ascenzo, Deputy General Counsel, and Jeanne W. Kingery, Associate General Counsel, urging reversal for amicus curiae Duke Energy Ohio, Inc.

Kegler Brown Hill & Ritter Co., L.P.A., and Robert Dove, urging reversal for amicus curiae Ohio Partners for Affordable Energy.

_____